**UNITED STATES of America, Plaintiff/Counterdefendant,**

v.

**Parks B. BANKS, Defendant/Counterplaintiff.**

**No. 91–10107–CIV–KING.**

United States District Court, S.D. Florida.

Jan. 13, 1995.

Barbara Bisno, Asst. U.S. Atty., Miami, FL and Martin McDermott, U.S. Dept. of Justice, Washington, DC, for plaintiff.

James Mattson, Key Largo, FL, for defendant.

## MEMORANDUM OPINION

JAMES LAWRENCE KING, District Judge.

This Clean Water Act case involves property on Big Pine Key, an island located in a chain of islands known as the Florida Keys. The United States alleges that the Defendant, Parks B. Banks, unlawfully placed pollutants in the form of fill material in adjacent freshwater wetlands without a permit. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345 and 1355, and 33 U.S.C. § 1319(b).

## I. THE NATURE OF THE ACTION

The Plaintiff, United States of America, seeks to obtain injunctive relief and civil penalties against the Defendant, Parks B. Banks, for violation of Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a). The United States alleges that Banks has filled, without obtaining a permit, five freshwater wetland Lots located on Big Pine Key, Florida. The United States further contends that the wetlands Lots are adjacent to navigable waters of the United States in that Lot QQ is adjacent to Pine Channel, and Lots IR, IQ, IP and IO are adjacent to Bogie Channel. For relief, the United States requests that the Court (a) enjoin the discharge by Banks of additional dredged and fill materials into the freshwater wetlands, (b) require Banks to remove materials which he has heretofore unlawfully discharged into the wetlands, (c) require Banks to restore the wetlands to their undisturbed condition prior to such unlawful discharges, and (d) require Banks to pay appropriate civil penalties.

Parks B. Banks admits to placing fill on the subject Lots, but alleges that the property is not jurisdictional wetlands, and therefore, did not require a Section 404 permit under the provisions of the Clean Water Act, 33 U.S.C. § 1344. Banks does not challenge the Corps' denial on April 5, 1984, of his after-the-fact individual permit application to fill Lots IR and IQ.

The trial in this matter was bifurcated in the interests of judicial economy, with the liability phase {items (a) and (b), above} tried in a bench trial, leaving issues of remedy and penalty {items (c) and (d), above} for later resolution by the Court.

For the reasons set forth below, the Court concludes that judgment must be entered for the Plaintiff. The Court finds that, from 1980 to 1983, the Defendant placed unauthorized fill on Lot IR and a portion of Lot IQ on Big Pine Key, Florida, which the Court finds to have been jurisdictional adjacent freshwater wetlands. These wetlands were adjacent to navigable and tidal waters of the United States. Further, the Defendant did not remove the fill when ordered by the

United States Army Corps of Engineers in 1984 to do so after the Corps denied his after-the-fact permit application. In the years following this permit denial, the Defendant placed additional fill on three other Lots he owned on Big Pine Key. These Lots, IP, IO and QQ, the Court also finds to be adjacent freshwater wetlands that could not be lawfully filled without a permit from the Corps. All of the unauthorized filling activities, as well as land-leveling and removal of natural vegetation were performed by the Defendant and his agents, to convert the sites to uplands for use in the Defendant's coconut tree farm operations.

## II. FINDINGS OF FACT

1. The United States alleges Parks B. Banks has violated the Clean Water Act[1] ("CWA") by his unauthorized discharges of pollutants into waters of the United States at Lots IR, IQ, IP, IO and QQ ("the Lots"), located in Section 22, Township 66 South, Range 29 East on Big Pine Key, Florida.

2. Mr. Banks currently owns the Lots and either placed fill on them himself with a dump truck, bulldozer or similar equipment, or had another individual place the fill for him. This fill took various forms, including rock pit material, silt, manure, organic debris, black dirt, palm fronds and refuse.

3. The subject Lots are adjacent to Bogie Channel and Pine Channel and are part of a meandering wetland slough that extends across Big Pine Key between the two channels. Both Bogie Channel and Pine Channel are tidal navigable waters and both connect to Florida Bay, a tidal navigable water. The band of wetlands is continuous from the Banks' Lots to the navigable waters.

4. The Lots lie south of Watson Boulevard, a paved road which crosses the wetland slough between Lots IR, IQ, IP, IO and Bogie Channel.

5. Defendant Banks purchased Lots IR, IQ, and QQ in 1980, and has owned those Lots since then. Lots IO and IP were purchased by Defendant in 1988 and have been owned by him since then.

6. Prior to being disturbed by Defendant Banks, Lot IR was vegetated with buttonwood, sawgrass, red mangroves and other wetland plant species as listed in the applicable regulations. Lots IQ, IP and IO were vegetated with sawgrass, slash pine and other wetland species; Lot QQ was vegetated with white mangroves, red mangroves, sawgrass, buttonwood, and other wetland species. A red mangrove pond which has been partially filled by Defendant, is located on the northwest corner of Lot IR. A similar red mangrove pond existed on Lot QQ prior to filling.

7. The wetland slough which crosses Big Pine Key is characterized by the expert witnesses as caprock wetlands. Caprock is a limestone that is highly porous and permeable below the surface. It is somewhat smooth on portions of its surface with cracks, crevices, and low places in which hydric soil accumulates and in which wetland vegetation grows. The soils in these cracks, crevices and low places are often saturated or inundated with water. The majority of the surface area in the wetland slough is covered by hydric soils, not barren caprock.

8. Defendant Banks began filling Lots IR and IQ almost immediately after purchasing them in 1980. Utilizing bulldozers to clear these parcels, he destroyed much of the existing vegetation (buttonwood and other wetland species) and placed six inches to one foot of fill over the Lots. This filling activity, which took place over a three year period, was undertaken to prepare the land for planting the seeds for his coconut palm farming operation. Banks did not notify the Corps of these activities, or seek a permit, either prior to or while they were ongoing.

9. In the mid–1980's, Defendant Banks poured a concrete slab and built a house on Lot IQ.

10. Refuse and other organic material as fill was dumped on Lot QQ in 1983. Mr. Banks then planted coconut palms in that fill. Additional palms were planted on this lot in 1993.

11. In 1989 and 1990, the Defendant built a two to three foot raised berm of crushed

1. "CWA", 33 U.S.C. § 1344.

limestone fill on the property on the western, southern and eastern sides of Lots IP and IO, continuing north on the eastern property line of Lots IQ and IR. Coconut palms were planted in the raised berm.

12. Defendant Banks did not have a permit required pursuant to CWA Section 404, 33 U.S.C. § 1344, authorizing any of these filling activities in waters of the United States.

13. In 1983, Curtis Kruer, field biologist for the Corps, became aware of the Defendant Banks' unlawful filling activities on Lots IR and IQ. The parties have stipulated that the Corps sent and the Defendant received a Cease & Desist Order in regard to this activity, requesting that Banks cease his filling activity and submit an after-the-fact permit application to the Corps.

14. Defendant Banks subsequently applied for an after-the-fact permit, for fill activities on Lots IR and IQ. The Corps issued a formal public notice of the application, as required by its regulations.

15. After evaluating the site and receiving comments pursuant to the public notice, the Corps denied the after-the-fact application on April 5, 1984, on the grounds that: 1) the property was valuable freshwater wetlands, a scarce resource and important habitat for Key Deer, for shore and wading birds, and other wildlife on Big Pine Key, and that destruction of such wetlands was not in the public interest; 2) that there were alternative sites available to Banks for his activity; and 3) that the activity was not considered water dependent under the regulations.

16. Defendant Banks was contacted by the Corps concerning his actions on Lot IR and Lot IQ (then vegetated with red mangroves, sawgrass and buttonwood) and told that the unauthorized fill which he had placed on these Lots should be removed. At that time in 1984, the Corps did not regulate wetlands dominated by "slash pine", the prevalent overstory vegetation on the major portion of Lot IQ. Therefore, Banks was informed that Lot IQ, with the exception of a small northeast corner, was uplands which could be utilized to continue his farming operations. Banks was also told that a small portion of the southeast corner of Lot IR was being considered uplands due to the presence of slash pines.

17. Mr. Banks did not submit another permit application, nor did he remove the fill from Lot IR or any of Lot IQ.

18. Mr. Banks received a letter in 1985 from the Corps' Office of Counsel, advising him that failure to remove the fill would result in a referral to the United States Attorney's Office for prosecution.

19. The Corps became aware in January, 1990 that the Defendant had undertaken additional filling activities on Lot IR. The parties have stipulated that the Corps sent, and the Defendant received, a Cease & Desist Order in February, 1990, ordering Banks to stop this fill activity and restore the property.

20. The Defendant purchased Lots IP and IO, immediately south of Lot IQ, in 1990 and commenced filling activities on those two additional Lots. The parties have stipulated that the Corps sent, and the Defendant received, additional Cease & Desist Orders in November, 1990, ordering him to stop those unpermitted activities on Lots IP, IQ and QQ.

21. In the period of time between the last communication from the Corps to Defendant Banks in 1985 and the Defendant's new fill activities in 1990, the 1987 Federal Wetlands Delineation Manual was published. This manual formalized and standardized the Corps' existing methodology for determining whether a property is a wetland. The Manual requires that a property must meet three requirements: hydrophytic vegetation, hydric soil, and wetland hydrology. Also, a much expanded list of wetland vegetation was published by the United States Fish and Wildlife Service in 1986. That list, as continuously updated, is utilized by the Corps to determine whether plants are hydrophytic.

22. Dr. William Kruczynski, the biologist who is the wetlands expert for the nine-state Region IV Office of the United States Environmental Protection Agency ("EPA"), testified that all five of the Defendant's · Lots would have met the three parameters re-

quired by the 1987 Manual, had they not been filled.

23. The Defendant does not contest the evidence that the predominant vegetation on all of the Lots, including the slash pine-wiregrass community on and surrounding Lots IQ, IO and IP, meets the wetland vegetation criterion stated in the 1987 Manual.

24. G. Wade Hurt, a soil scientist with the Soil Conservation Service, United States Department of Agriculture, testified for the Plaintiff that more than fifty per cent of the Lots' surfaces are covered with hydric soils. The Court finds this testimony to be more credible than that of Defendant's expert, Dr. Luther Holloway, who testified that the Lots comprise a caprock area that is mostly solid exposed rock and has virtually no soils. Mr. Hurt accurately classified and categorized the soils and soil coverages on the Lots.

The Defendant's witnesses do not seriously dispute the testimony of Dr. Kruczynski, Mr. Hurt, and Dr. Ronald Jones, expert witnesses for the Plaintiff with extensive experience with Florida wetlands, that although barren caprock exists in small sections on the Lots and the surrounding properties, these areas were thriving wetland communities before being disturbed by Banks. Wetlands vegetation extensively covers the property immediately surrounding the Banks' Lots.

25. Plaintiff established that the water level at each of the five Lots easily meets the minimum hydrology criterion of the 1987 Manual. All of the properties are inundated or saturated to the surface, for at least five per cent of the growing season. The root zone is the top twelve inches below the surface. The data on water levels was obtained by Mr. Kruer, using an average elevation for each of the Lots based on the stipulated survey and on actual measurements of the water levels in nearby mosquito ditches for a monitored period of 172 days.

The Defendant contends that the water levels in the mosquito ditches are not indicative of water saturation levels at the Lots because the caprock is, in the Defendant's view, not readily permeable below the surface. This contention is not born out by the record. The Defendant's expert testified

he did not do any hydrological studies of the Lots, and his testimony is directly contrary to the convincing testimony of Mr. Hurt, Mr. Kruer and Dr. Jones. The Plaintiff's experts all testified that limestone is extremely porous and that numerous hydrological studies of Big Pine Key establish that the water readily travels under the surface. Thus, the Court finds the water levels in the ditches correspond to the saturation levels of the Lots and meet the saturation criterion of the Manual.

26. Dr. William Kruczynski testified that on several occasions, including the day before trial, he walked the area from Bogie Channel to Pine Channel, passing through the subject Lots. Except for crossing Watson Boulevard and Key Deer Boulevard, Dr. Kruczynski remained in wetlands the entire way. The aerial photographs from 1975, 1981, 1983, 1984 and 1991, show wetland vegetation signatures of sawgrass and mangroves on the wetland slough traversing across the subject Lots and Big Pine Key. Dr. Kruczynski also testified that wetlands were continuous between Lot QQ and Pine Channel.

27. Dr. Holloway, testifying for the Defendant, agrees that there are wetlands from Bogie Channel all the way to Watson Boulevard. He states, however, that he believes there are upland pockets that isolate wetland pockets between Lot IR and Watson Boulevard. His testimony does not convince this Court that the wetlands between Lot IR and the tidal coast line are surrounded by uplands that would disrupt the "adjacency" of the Lot IR wetlands to Bogie Channel to Lot IR. The Court finds that continuous wetlands do exist from Lot QQ to Pine Channel, as confirmed by various aerial photographs and the testimony of the witnesses. Both Pine and Bogie Channels are tidal navigable waters which connect with Florida Bay, a tidal navigable water. A wetland slough does exist in this area.

28. The Court finds, therefore, that all five of the Lots are adjacent freshwater wetlands and that none of the Lots are isolated wetlands.

29. After the Corps' denial of his after-the-fact permit application, and issuance of

the Cease & Desist Orders, the Defendant continued to fill the sites and to destroy vegetation on the sites. He did not remove any fill or endeavor to restore the sites.

30. Defendant Banks' destruction of the Lots' wetland vegetation, and his leveling, spreading and filling activities on these Lots raised their elevation.

31. The Defendant's leveling, spreading and filling activities have caused identifiable adverse effects, both individual and cumulative, on the sites' vital aquatic and habitat functions.

32. The Plaintiffs' experts testified that the Lots, which are located less than a mile from the Key Deer Refuge, provide habitat for Key Deer, an endangered species. In its filled condition, the property no longer fully serves as a ready natural source of ponded water. Also, the diversity of natural vegetation that serves as food for the Key Deer and other animals has been seriously disturbed.

33. Further, Wayne Hoffman, a research scientist for the National Audubon Society, testified that prior to being filled, the Lots were available to migratory wading birds, such as ibises, herons, and egrets, for feeding in times of high tides and heavy rains on the coast. In times of drought, these wading birds benefit from the interior freshwater wetlands, such as those that formerly were found on Banks' Lots, since fish are concentrated in the drying pools of water caught in the low areas. Non-wading birds, such as kingfishers, use the interior freshwater wetlands for feeding as well. Migratory passerine birds, such as palm warblers and the Savannah sparrow, feed on insects found in the variety of native wetland vegetation that is no longer available on the Lots which, having been filled by Banks, are intensively cultivated with a single crop.

34. A report of wildlife observations by Curtis Kruer during his 172 days of water level monitoring at the Lots (Govt. Exh. 12) shows that the properties serve as habitat for fish, frogs, Lower Keys mud turtle and box turtle, in addition to a large variety of migratory wading and non-wading birds.

35. Dr. Ronald Jones testified that the freshwater wetlands in the interior of Big Pine Key, which are part of a freshwater lens system, are critical to the proper functioning of Big Pine Key's ecosystem because, like the Everglades, they serve as a filter, and thus enhance water quality.

36. All of the biologists and other scientists who testified for the Plaintiff, Dr. Kruczynski, Mr. Kruer, Mr. Hurt, Dr. Jones and Dr. Hoffman, testified that freshwater wetlands such as the Lots in their undisturbed condition are a scarce natural resource which in the Keys, are found primarily on Big Pine Key.

37. On April 19, 1994, the Environmental Protection Agency issued Defendant Banks an Administrative Order (404–94–19) to cease any additional discharges of any pollutant on Lot QQ and to submit a restoration plan for the discharge area within fifteen days of receipt of the Order. Defendant Banks has not submitted a restoration plan for this additional violation.

### III. CONCLUSIONS OF LAW

1. "The Clean Water Act, 33 U.S.C. § 1251 *et seq.,* is a comprehensive effort by Congress to restore and maintain the chemical, physical and biological integrity of the nation's waters." *United States v. Carter,* 18 Env't Rep.Cas. (BNA) 1804, 1807 (S.D.Fla. 1982) (citing 33 U.S.C. § 1251). The cornerstone of the CWA regulatory scheme is Section 301, 33 U.S.C. § 1311, which prohibits the discharge of pollutants into navigable waters except when in compliance with various provisions of the Act, including Section 404, 33 U.S.C. § 1344. *Id.*

2. "Section 404 establishes a program for the issuance of permits for the discharge of dredged or fill material subject to certain criteria and standards aimed at achieving the goals of the Act." *Id.* at 1807, n. 1. Pursuant to § 404(a), the Corps has responsibility for administering this permit program, by evaluating applications pursuant to promulgated federal regulations. *Id.*

3. Section 320.4 of the Corps regulations, promulgated in 1980 and in effect today, provides that in evaluating applications, the Corps engage in a public interest review (§ 320.4(a)) in which the probable impacts,

including cumulative impacts, of the project on the public interest are considered. This balancing process must weigh factors such as conservation, economics, aesthetics, general environmental concerns, wetlands, cultural values, fish and wildlife values, and flood hazard. No permit may be issued unless it is found to be in the public interest. 33 C.F.R. § 320.4. In addition, no permit can be issued unless it conforms to the environmental Protection Agency's Section 404(b)(1) Guidelines (40 C.F.R. 230) (33 C.F.R. § 323.6(a)) which specify additional impact review criteria.

■■ 4. The act of "discharging of a pollutant" occurred here when Defendant Banks utilized dump trucks, bulldozers and other equipment to place rock-pit fill, manure fill, silt, organic debris and other fill material on the Lots. The term "discharge of a pollutant" is defined in 33 U.S.C. § 1362(12) as "any addition of any pollutant to navigable waters from any point source." *See Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 923 (5th Cir.1983). The term "point source" includes bulldozers, dump trucks, and other equipment used to place dredged or fill material in waters of the United States. *Weiszmann v. District Engineer, United States Army Corps of Engineers,* 526 F.2d 1302, 1306 (5th Cir.1976).

5. Rock fill, dirt, organic debris, and biological materials fall within the broad meaning of the term "pollutant". 33 U.S.C. § 1362(6); *United States v. Carter,* 18 Env't Rep.Cas. at 1807; *United States v. Huebner,* 752 F.2d 1235, 1242 (7th Cir.), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985). Defendant's covering, leveling, grading, and filling of the formerly vegetated sites at issue were discharges of a dredged soil, biological material, rock and/or sand, each of which is defined as a pollutant by the CWA. These discharges changed the bottom elevation of the sites. *See Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d at 924–25 (Landowner violated CWA by discharging fill materials into wetland in an effort to change the bottom elevation of the land and convert it to upland.)

6. "Navigable waters" means "waters of the United States," 33 U.S.C. § 1362(7).

"Waters of the United States" are defined by 33 C.F.R. § 328.3(a)(1), (3), (5) and (7) and 40 C.F.R. § 232.2(q)(1), (3), (5) and (7) to include the following: (i) all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce; (ii) all other waters such as, among other things, wetlands or sloughs, the use, degradation or destruction of which could affect interstate or foreign commerce; (iii) tributaries to such waters; and (iv) wetlands adjacent to such waters or their tributaries.

7. "Wetlands" are defined by 33 C.F.R. § 328.3(b) and 40 C.F.R. §§ 122.2 and 232.2(r), as those areas that are "inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 U.S.C. § 1344(a)–(b); 33 C.F.R. § 328.3(b); *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 129, 106 S.Ct. 455, 460, 88 L.Ed.2d 419 (1985). "Wetlands generally include swamps, marshes, bogs, and similar areas." 33 C.F.R. § 328.3(b).

■■ 8. Congress intended the statutory definition of "waters of the United States" to assert "federal jurisdiction" over the Nation's waters to the maximum extent possible under the Commerce Clause of the Constitution. *See Riverside Bayview Homes,* 474 U.S. at 133–34, 106 S.Ct. at 462–63; *United States v. Tilton,* 705 F.2d 429, 431 (11th Cir.1983).

9. The parties have agreed that the determination of the wetlands issue shall be controlled by the Corps of Engineers Wetlands Delineation Manual (1987) ("the Manual"). The Manual provides that a wetland must meet three parameters: it must have hydrophytic vegetation, hydric soil and wetland hydrology. To determine hydrophytic vegetation, the Manual states the criterion as follows: more than fifty per cent of the dominant species shall be "obligate" wetland species (plants that occur almost always in wetlands under natural circumstances), "facultative wetland" species (plants that occur usu-

ally in wetlands) or "facultative" species (plants with a similar likelihood of occurring in both wetlands and non-wetlands). (Manual at 18–19.)

10. Wetland delineation also requires the presence of "hydric" soils which are defined as soils that are saturated, flooded or ponded long enough during the growing season to develop anaerobic conditions that favor the growth and regeneration of hydrophytic vegetation. (Manual at 14 and 26.)

11. An area will meet the hydrology test for wetlands if the soil is saturated to the surface for a specified period of time during the growing season. This period of inundation or soil saturation varies according to the hydrologic/soil moisture regime and occurs in both tidal and nontidal situations. The subject Lots exceed the minimum hydrological criterion of inundation or saturation within twelve inches of the surface for five per cent of the growing season (Manual at 36–38.)

12. Dr. Kruczynski, Mr. Hurt, Mr. Kruer and Dr. Jones testified that all of the Banks' Lots meet the three parameters outlined above. The Court finds this testimony convincing for the reasons outlined in the Court's Findings of Fact. Therefore, under the law and regulations and the Manual promulgated thereunder, the Court finds that the Lots are freshwater wetlands.

■ 13. The law also requires the Court to decide if the Lots are "adjacent" or "isolated" wetlands. This determination must be made because if the wetlands are isolated and less than one acre of fill was placed in the wetland in 1980–1983, under the controlling regulations in 1977 and 1982, the Defendant would have been potentially eligible for a general permit for Lot IR and the wetland portion of Lot IQ. However, if the wetlands are found under the law to be adjacent or if the Corps chose to override any applicable general permit because of the cumulative effect of the fill, then the Corps acted properly in requiring the Defendant to submit an application for an individual permit. *See O'Connor v. United States Army Corps of Engineers*, 801 F.Supp. 185, 190–91 (N.D.Ind.1992) (describing Corps permitting process).

It is the Defendant's position that the five Lots in question are "isolated" and not "adjacent" wetlands to either Bogie Channel or Pine Key Channel. The Defendant argues that the subject Lots are all at least one-half mile from either of the two navigable water channels and thus have no hydrological relationship with any body of navigable water. Between Lots IO through IR and Bogie Channel is a fifty foot wide paved, elevated street called Watson Boulevard. This street, constructed decades ago, blocks any flow of water between Defendant's Lots and the navigable waters of Bogie Channel according to the testimony of Defendant's witness.

14. Adjacent means bordering, contiguous, or neighboring. Wetlands, even if separated from other waters of the United States by dikes, barriers, natural berms, beach dunes and the like, are still considered "adjacent wetlands." 33 C.F.R. § 328.3(c); *United States v. Tilton*, 705 F.2d at 431.

15. The regulations provide that even if it were found that the flow of surface water from the Lots into a navigable water were impeded by a manmade barrier such as Watson Boulevard, that does not defeat a finding that wetlands are adjacent and therefore subject to the individual permitting process. *Id.; United States v. Lambert*, 589 F.Supp. 366, 371 (M.D.Fla.1984). Thus, even if Watson Boulevard impedes or partially blocks the free flow of the surface connection between the Lots and Bogie Channel, the Lots are still adjacent wetlands. In light of the regulation establishing that manmade barriers cannot be considered isolating mechanisms, no hydrological connection to other waters is required for a wetland to be considered adjacent.

More importantly, however, in this case, the government established that such a connection exists through ground water and through surface waters during storm events. Such a hydrological connection to neighboring navigable waters primarily consisting of ground water rather than surface water, except in times of storms, such as hurricanes, therefore further supports a finding of adjacency. *United States v. Tilton*, 705 F.2d at 431, n. 1.

16. A finding of adjacency may be bolstered by a showing of ecological links with neighboring navigable waters, such as serving as wetland habitat for wading and non-wading birds, reptiles and fish as well as by testimony regarding the performance of water quality filtering functions. *Id.*

17. Therefore, the expert scientific and wildlife observation testimony offered on behalf of the Plaintiff establishes that the Lots are adjacent from an ecological standpoint in that: 1) there is a surface connection between the Lots and navigable waters during storms and a subsurface connection at all times; and 2) the Lots serve as habitat for wading and non-wading birds, fish, Lower Keys mud turtles and box turtles, a variety of snakes, and other wildlife.

18. Dr. Kruczynski, Mr. Kruer, and Dr. Jones also testified that the Lots are a part of a meandering wetland slough traversing Big Pine Key to Pine Channel on the west and Bogie Channel on the east. There is no credible contrary testimony in the record. Therefore, under the law, the Lots are adjacent wetlands, not isolated wetlands, and thus do not qualify for a general or nationwide permit.

19. In its undisturbed condition, all of Lot IQ would properly be considered, under the 1987 Manual, an adjacent freshwater wetland, as are all of the other four Banks' Lots.

20. The government in 1983, under less well developed standards concerning slash pine trees, advised Mr. Banks that the major portion of Lot IQ was primarily an *upland* Lot. For this reason, the Plaintiff waives any restoration rights it may have, as well as any finding of violation of the CWA, regarding the major portion of Lot IQ. The Court finds that the Corps appropriately delineated the major portion of Lot IQ and a small portion of Lot IR, primarily an upland Lot in 1983, though both lots would be delineated an adjacent freshwater wetlands today under the 1987 Manual. The changed position today, is grounded on additional knowledge the Corps has gained in regard to wetland delineation, and, specifically, in regard to wetland vegetation classification. *See Alma v. United States,* 744 F.Supp. 1546, 1561–62 (S.D.Ga.1990) (finding that EPA did

not act arbitrarily in changing its prior determination when agency gave reasoned explanation and effectuated change to serve public interest). Wetlands constitute a productive and valuable resource. Their unnecessary and unpermitted filling and destruction constitutes a serious violation of the CWA and should be discouraged as contrary to the public interest.

21. Wetlands perform vital functions important to the environment. These scarce interior freshwater wetlands of Big Pine Key serve, among other things, as habitat for the endangered Key Deer species and for a variety of migratory wading and non-wading birds, e.g., including egrets, herons, ibises, kingfishers and warblers. The testimony proffered by the Plaintiff shows that these wetlands also serve to enhance water quality, an important wetland function. *Conant v. United States,* 786 F.2d 1008, 1009 (11th Cir.1986) (citing *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 134, 106 S.Ct. 455, 463, 88 L.Ed.2d 419 (1985)). It is well established that wetlands such as these also serve as storage areas for storm and flood waters and to stem erosion and control sedimentation. *See* 33 C.F.R. § 320.4(b); 40 C.F.R. § 230.41; *Riverside Bayview Homes,* 474 U.S. at 134, 106 S.Ct. at 463.

22. The Court concludes that the Lots at issue constituted waters of the United States at the time of the Defendant's activities.

23. The Court concludes that the Lots also constituted jurisdictional wetlands at the time of the Defendant's activities.

The Court concludes that these Lots do not qualify for waiver of regular Corps permitting procedures under the silviculture activity exclusion, 33 U.S.C. § 1344(f)(1)(A); 33 C.F.R. 323.4 or Nationwide Permit 26 and its predecessors, 33 C.F.R. § 330.4(a)(2) (1982) and 33 C.F.R. § 330.5(a)(26)(ii) (1984, 1986).

24. The Court also concludes that the Defendant's continuous and continuing disregard for the government's regulatory demands that he cease filling these freshwater wetlands violated applicable law and harmed the environment.

25. The Court concludes that the Defendant has violated the Clean Water Act by discharging pollutants in the form of fill into the waters of the United States on Lots IR, IP, IO, QQ and a portion of IQ, without a permit.

26. Section 1314(b) of CWA requires compliance with administrative orders. The Court concludes that the Defendant has violated the CWA by failing to comply with the EPA's administrative order requiring him to restore the disturbed wetlands on Lot QQ.

For the foregoing reasons, the Court finds in favor of the Plaintiff and against the Defendant.

It is

ORDERED, ADJUDGED and DECREED as follows:

1. The Defendant Parks B. Banks, his agents or employees, be and they are hereby enjoined from discharging additional fill materials into the property owned by him on Big Pine Key, Florida, as described in this Memorandum Opinion.

2. The Defendant, Parks B. Banks, be and he is hereby ORDERED to remove (or cause to be removed) the fill material which he has unlawfully discharged into said wetlands, in accordance with a time schedule to be agreed upon between Defendant and Plaintiff. This time schedule, for removal of the unauthorized fill material, shall be filed with the Court on or before February 14, 1995.

3. Restoration of the wetlands to their undisturbed condition prior to the unlawful filling, and determination of civil penalties shall be adjudicated at a trial to be scheduled by separate order.

DONE and ORDERED.