**SIERRA CLUB, Mobile Bay Audubon Society, and Native Forest Network, Plaintiffs,**

v.

**U.S. ARMY CORPS OF ENGINEERS, William S. Vogel, and City of Mobile, Alabama, Defendants.**

Civil Action No. 96–0672–CB–M.

United States District Court,
S.D. Alabama,
Southern Division.

Aug. 27, 1996.

Ray Vaughan, Montgomery, AL, for plain-
tiffs.

Ronald Wise, U.S. Attorneys Office, Deborah J. Shoemake, U.S. Army Corps of Engineers, J. Gordon House, Jr., John R. Lockett, Mobile, AL, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BUTLER, Chief Judge.

This matter is before the Court following a hearing held in open court on August 19, 1996. Although this court proceeding was originally conceived as a hearing on the plaintiffs' motion for preliminary injunction, plaintiffs' counsel suggested that, in the interests of efficiency, said hearing could also properly serve as a trial on the merits. Defense counsel offered no objections, and the Court determined that the preliminary injunction hearing could proceed as a trial on the actual merits of this action. After careful consideration of the parties' exhaustive written submissions, as well as of the arguments and evidence presented prior to, during, and after the hearing, the Court finds that the plaintiffs' claims are due to be **DENIED,** and that this action is due to be **DISMISSED** with prejudice for the reasons set forth below.[1]

### I. Findings of Fact

This action arises from efforts by defendant City of Mobile, Alabama ("the City") to construct an 8,000 seat AA professional baseball stadium and accompanying 2,100 space parking lot near Interstate 65 in Mobile, Alabama. On January 15, 1996, the City filed an application (numbered AL96–00098–L) for a wetlands fill permit with defendant U.S. Army Corps of Engineers ("the Corps"). Admin. Record, at tab 7. Through this permit application, the City sought permission to fill approximately 19.9 acres of transitional wetlands for construction of a baseball stadium complex on a 30 acre tract of land bounded by Interstate 65, Highway 90, McVay Road, and Halls Mill Road. The 30 acre parcel in question is part of a larger, privately-owned 180 acre tract ("the McGowin tract"). After extensive negotiations, the private land owners donated the 30 acre parcel to the City specifically for the purpose of developing the baseball stadium and parking lot thereon.[2]

In conjunction with the permit application, the City submitted a document entitled "Alternatives Analysis", in which the City assessed the relative desirability of eleven different potential sites for construction of the baseball stadium. Admin.Record, at pp. 00076–00090. The conclusion reached by the City in its alternatives analysis was that the McGowin tract was superior to all of the other potential construction sites, based on the overriding criteria of size, accessibility, visibility, and cost-effectiveness.[3] Admin.Record, at p. 00086.

On January 22, 1996, the Corps issued public notice of the City's permit application. Admin.Record, at tab 12. In a letter received by the Corps on February 14, 1996, the U.S. Environmental Protection Agency ("EPA") raised several concerns about the methods used by the City in its alternatives analysis, the possibility of re-orienting the stadium on the site so as to avoid or reduce the contemplated wetlands impact, and the selection of the mitigation site. Admin.Record, at tab 24. On February 21, 1996, the U.S. Fish and Wildlife Service advised the Corps of its recommendation that the permit be denied on the grounds that the wetlands

---

1. As the relief sought was injunctive and declaratory in nature, the trial was conducted without a jury. Accordingly, pursuant to Rule 52(a), Fed. R.Civ.Pro., the Court hereby enters its findings of fact and conclusions of law in this matter.

2. In total, the McGowin tract contains approximately 43 acres of transitional wetlands, spread over three different locations. These wetlands form a part of the Dog River drainage basin, and Dog River ultimately flows into Mobile Bay. The original stadium plan submitted with the application placed the stadium itself and part of the parking lot on 19.6 acres of a 40 acre patch of wetlands, with an additional 0.3 acres of wetlands from a different area on the McGowin tract to be filled in order to facilitate construction of the access road to the stadium.

3. The City also submitted a mitigation plan in which it proposed to mitigate the loss of wetlands on the McGowan tract by creating 16.5 acres of forested and marsh wetlands near West Fowl River.

in question were important environmental resources, the proposed stadium complex was not water-dependent and therefore needed not be constructed on wetlands, and the planned stadium did not maximize use of available on-site upland areas which could have reduced or eliminated any wetlands impact caused by the development. Admin.Record, at tab 27. During the public notice period spanning from January 22, 1996 until February 25, 1996, the Corps also received numerous negative comments regarding the City's proposal from members of the public.

On April 23, 1996, the City revised its proposal by agreeing to set aside three acres of wetlands in the 30 acres of stadium development property, thereby reducing the wetlands loss from 19.9 acres to 16.9 acres. Admin.Record, at tab 67. As part of its revised proposal, the City also offered to set aside seven acres of wetlands on the McGowin tract adjacent to the baseball stadium parcel as a buffer to the development. *Id.* On April 30, 1996, the Fish and Wildlife Service commented on the City's revised proposal by recommending that additional inquiries be made as to the possibility of wetland avoidance before the Corps issued the permit.[4] Admin.Record, at tab 73. Similarly, on May 17, 1996, the EPA commented on the proposal to fill 16.9 acres of wetlands by reiterating its concern that wetland impacts could be either avoided altogether or mitigated further by the City.[5] Admin.Record, at tab 97.

On May 8, 1996, McGowin property owners' representative Joe H. Little, Jr. advised the City in writing that the 30 acre tract originally offered for the stadium was the only acreage which the land owners would make available for the stadium.[6] Admin.Record, at tab 81. On May 15, 1996, the City supplied a revised alternatives analysis to the Corps. This supplemental analysis addressed some of the comments and concerns which had been raised by various agencies and members of the public during the public notice period for the previous proposal. Admin.Record, at tab 91. The City submitted additional supplemental information regarding alternative sites to the Corps on May 21, 1996. Admin.Record, at tab 101. Also on May 21, 1996, plaintiffs' counsel Ray Vaughan ("Vaughan") wrote a letter to the Corps in which he urged them to consider the possibility of moving the entire stadium project to the uplands which abut the wetlands on the McGowin tract. Admin.Record, at tab 102. He further advised the Corps of his belief that there was insufficient evidence in the administrative record to support any conclusion that it was impracticable to avoid wetlands disruption by moving the stadium complex to the uplands. *Id.*

On May 23, 1996, the City informed the Corps of a substantial alteration to the plans for the stadium which would result in the reduction of wetlands impact from 16.9 acres to 7.4 acres. Admin. Record, at tab 196. Pursuant to this third variation on the stadium design theme, the proposed stadium site was moved to the southwestern corner of the

4. The Fish and Wildlife Service's concerns regarding the City's revised proposal revolved primarily around the possibility of wetlands avoidance, as summarized below:

 "In view of the adjacent uplands at the ball park project site, avoidance mitigation seems to be a viable option in lieu of filling wetlands for a non-water dependent use. The reasons for not avoiding wetland impacts should be adequately explained before agency acceptance of compensation for unavoidable wetland impacts is sought." Admin.Record, at tab 73.

5. The EPA succinctly summarized its objections in the following manner:

 "Though the applicant has reduced the wetland impact from 19.6 acres [not including the 0.3 acres for the access road] to 16.6 acres [ditto], EPA remains concerned that this is a

non-water dependent project and wetland impacts from the project could be avoided altogether.... We are not yet convinced that the avoidance and minimization requirements of the guidelines have been met." Admin.Record, at tab 97.

6. This letter contained the following language:

 "Please allow this letter to confirm that the thirty (30) acres provided for in the Ground Lease dated April 16, 1996 between McGowin Properties, Ltd. and the City of Mobile is the only acreage owned by McGowin Properties, Ltd. that is available to the City for a baseball stadium site. *There is no additional or alternative acreage which the partnership is willing to make available for the stadium other than the thirty (30) acres previously agreed upon.*" Admin.Record, at tab 81 (emphasis added).

McGowin property, with the land owners' consent.[7] Admin.Record, at tab 113. As redesigned, the stadium itself would no longer be constructed upon a former wetlands area; however, approximately 1,000 parking spaces would be dependent on the 7.4 acres of wetlands being filled and developed.

In a letter dated May 24, 1996, City Mayor Michael C. Dow ("Mayor Dow") advised the Corps of recent discussions with the property owners. Mayor Dow indicated that the property owners had informed him "emphatically and finally" that they would make no additional or alternative land available on the 180 acre tract, and noted the property owners' assertion that "further expansion of the baseball stadium site would significantly impact their ability to develop the surrounding area and would be contrary to their development plans."[8] Id. With respect to this third proposal, on May 24, 1996, the Corps denied a request for public hearing on the ground that such a hearing would provide no additional information which would assist the Corps in determining whether or not a permit should issue. Admin.Record, at tab 114.

On May 24, 1996, the Corps faxed information concerning the City's third proposal to the EPA and to the Fish and Wildlife Service. Admin.Record, at tabs 110, 111. On the morning of May 28, 1996, the Corps faxed City-provided maps of the new site plan and mitigation area to those agencies. Admin.Record, at tabs 118–120. Shortly before noon on the same date, without having received comments or recommendations from either the EPA or the Fish and Wildlife Service, the Corps released a Statement of Findings which stated, in relevant part, that:

"Based upon review of the application, as revised, formulation of an environmental assessment, 404(b)(1) evaluation, consideration of comments by other agencies and the public, and after weighing all known factors involved in the proposed action, [the Corps found that] ... the public inter-

est would best be served by issuance of the permit...." Admin.Record, at pp. 00740–41.

As an attachment to the Statement of Findings, the Corps also released a document entitled "Environmental Assessment." Admin.Record, at pp. 00742–00765. In this attachment, the Corps noted that the 7.4 acres of wetlands impacted by the stadium project were of low quality and represented a mere 0.1% of all remaining wetlands in the Dog River drainage basin. Admin.Record, at p. 00748. The assessment included a discussion of the feasibility of each of thirteen alternative sites for the stadium, as well as a "no action" alternative, and explained why each was rejected as inferior to the course of action chosen. Admin.Record, at pp. 00753–00756. With respect to alternative configurations within the 180 acre tract, the Corps noted in the report that relocation to the north along I–65 would impact additional wetland acreage, that relocation to the east would reduce stadium visibility from the interstate and disrupt nearby residential areas, that relocation to the southeast could severely disrupt a cultural resource site, and that the property owners had indicated that there was no additional property on the McGowin tract which would be made available to the City. Admin.Record, at p. 00756. In light of these concerns, the Corps "concluded that the current site and configuration represent the least damaging practicable alternative to accomplish the project purpose." Id.

In the Environmental Assessment, the Corps also explained why the permit was issued without waiting for additional commentary from the Fish and Wildlife Service or the EPA. As to these agencies, the report indicated that the applicable regulations do not require endorsement of the project by either the EPA or the Fish and Wildlife Service as a necessary precondition to permit issuance. Admin.Record, at pp. 00760–61. However, the Corps did assimilate and re-

---

7. The new plan also provided for mitigation of the 7.4 acres of wetlands lost. Specifically, the City announced its plan to restore 15 acres of wetlands at a site near Three–Mile Creek. Admin.Record, at tab 113.

8. It appears that Mayor Dow obtained his information regarding the property owner's unequivo-

cal refusal to provide any additional or different lands for construction of the stadium complex at meetings with the land owners on May 22, 1996. Admin.Record, at tab 107. Members of the Corps were present at these meetings. Id.

**1564**

spond to earlier comments from both agencies in the report. Admin.Record, at pp. 00757–61. The assessment concluded that the stadium project was not a major federal action which would significantly affect the quality of the environment, and that an Environmental Impact Statement was not required. Admin.Record, at p. 00765. In light of this conclusion, the Corps did not prepare an Environmental Impact Statement assessing environmental effects of the City's proposed project.

In accordance with the statement of findings, the Corps issued a signed permit to the City on May 28, 1996. Admin.Record, at tab 124. Shortly after its issuance, both the Fish and Wildlife Service and the EPA advised the Corps in writing of their dissatisfaction with the Corps' decision, and asserted concerns about wetland avoidance, proper mitigation sites, and the process through which the permit was issued without obtaining agency comment on the revised proposal. Admin.Record, at tabs 138, 143. The Corps wrote back to both agencies, explaining why it was impossible to avoid wetland impacts, why other mitigation sites were not available, and why the Corps believed that the views of both agencies were fully considered during the permitting process. Admin.Record, at tabs 144, 145.

On July 16, 1996, plaintiffs Sierra Club, Mobile Bay Audubon Society, and Native Forest Network filed the instant action against the City, the Corps, and William S. Vogel ("Vogel"), the Corps' District Engineer who was involved in the permitting decision. In their complaint, plaintiffs alleged that the defendants' actions and omissions had violat-

ed the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.;* the Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. § 661 *et seq.;* the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.;* and the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.* The plaintiffs seek relief in the form of a permanent injunction voiding the permit and mandating that the defendants comply with the applicable statutory and regulatory authorities.

In their complaint, the plaintiffs allege, *inter alia,* that the defendants violated NEPA by not fully considering certain readily identifiable alternatives to the permit as issued. In particular, the plaintiffs argue, the defendants failed to consider fully at least two practicable alternatives: (1) the option of building the ballpark on the upland portion of the 180 acre tract, thereby avoiding the entire wetlands area; and (2) the option of redesigning the parking lot to create satellite parking (on upland ground) or to build a parking deck, thereby eliminating the need for wetlands to be filled on the site. Plaintiffs allege that the Corps' failure to consider these alternatives violated NEPA, the CWA, and the APA. At the trial on the merits, the plaintiffs offered no witnesses regarding the practicability of either of these alternatives.[9] The defendants presented Mayor Dow's May 24, 1996 letter as to the feasibility of the first alternative, and the testimony of John Bell ("Bell"), Executive Director of Public Services for the City, and Clifton Lambert, Vice President in charge of construction management at David Volkert & Associates, Inc., as to the feasibility of the second alternative.

9. More generally, however, the plaintiffs offered several exhibits which, they contended, established that other alternative sites were practicable. In particular, they offered a videotape of a local news broadcast on July 12, 1996, in which a reporter stated that Mayor Dow had asserted that the City would "do what it must" to get the stadium and parking lot built, even if the parking lot had to be moved or the number of spaces reduced. *See* Exhibit J to Plaintiffs' Motion for Preliminary Injunction. At trial, plaintiffs also submitted a transcript from a radio talk show on June 14, 1996, in which Mayor Dow stated that "there's nothing that's going to prevent that ball stadium from being built" and that "[w]e've been searching for ballpark sites and, ah, had several

we could have got." Plaintiff's Exhibit 4. Finally, plaintiffs submitted a transcript of the Mobile City Council meeting on August 6, 1996. The transcript reveals that two council members suggested that it would be possible to obtain additional upland acreage on the McGowin tract if this Court were to enjoin the City from filling in the 7.4 acres of wetlands. *See* Plaintiff's Exhibit 1. One council member bluntly stated, "I don't think the 7 acres will hold the project up." *Id.* Based on this evidence (which lies outside the administrative record), the plaintiffs contend, there were alternatives available under which the City could have erected the stadium complex without destroying any wetlands.

The plaintiffs' complaint also alleges that the Corps acted improperly by granting the permit one working day after the third proposal was submitted to the EPA and the Fish and Wild Service, without public notice and before either agency had been afforded a reasonable opportunity to review and comment on the revised proposal. Plaintiffs contend that these procedural anomalies run afoul of the FWCA, the CWA, and NEPA, and that the resulting permitting decision was rendered arbitrary and capricious, in violation of the APA, as a result.

## II. Conclusions of Law

### A. Standard of Review

 In this action, the plaintiffs seek review by this Court of the Corps' decision to issue the wetlands fill permit to the City, as well as of the procedural mechanisms underlying the Corps' decision in this case. As the plaintiffs seek judicial review of an agency decision, the proper standard of review in this matter is provided by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.[10] Indeed, under the APA, this Court may set aside the Corps' permitting decision only if the Court finds that the Corps' actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard has been applied in environmental challenges brought under NEPA. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (Corps' decision cannot be set aside unless found to be arbitrary or capricious); *North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1539 (11th Cir.1990) (same); *Pre-*

*serve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers,* 87 F.3d 1242, 1246 (11th Cir.1996) (same in action under CWA and NEPA). In determining whether an agency decision is arbitrary and capricious, the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). Under this "exceedingly deferential" standard, the Court may not substitute its judgment for that of the agency, but may only set aside the Corps' decision for "substantial procedural or substantive reasons as mandated by statute." [11] *Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 541–42 (11th Cir.1996).

 A logical corollary of the deferential standard of review and the "presumption of regularity" which attach to an agency's decision is that the party challenging such a decision must bear the burden of establishing that the agency acted in an arbitrary and capricious fashion. Indeed, under the APA, the burden of proving that an agency decision was arbitrary or capricious generally rests with the party seeking to overturn the agency decision.[12] *See Sierra Club v. Marita,* 46 F.3d 606, 619 (7th Cir.1995) (party challenging Forestry Service's decision under APA bears burden of proof); *see also Holmes v. Department of Veterans Affairs,* 58 F.3d 628, 632 (Fed.Cir.1995); *Gulf Power Co. v. F.E.R.C.,* 983 F.2d 1095, 1099 (D.C.Cir. 1993); *McKinley v. United States,* 828 F.Supp. 888 (D.N.M.1993); *Harris v. United States,* 820 F.Supp. 1018 (N.D.Miss.1992).

---

10. It is well-established that district courts have jurisdiction under the APA to review decisions by the Corps to grant section 404 permits. *See Conservation Law Foundation v. Federal Highway Administration,* 24 F.3d 1465, 1471 (1st Cir. 1994); *Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1521 (10th Cir.1992); *Sierra Club v. Pena,* 915 F.Supp. 1381, 1392 (N.D.Ohio 1996).

11. The fact that two other federal agencies, namely the EPA and the Fish and Wildlife Service, reached a different conclusion about the propriety of issuing the permit than did the Corps does not alter the standard of review. Indeed, "[w]hen specialists express contrary

views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861; *North Buckhead,* 903 F.2d at 1539.

12. Similarly, under NEPA, the party challenging the agency action bears the burden of showing by a preponderance of the evidence that the agency failed to follow NEPA's requirements. *See Druid Hills Civic Ass'n v. Federal Highway Administration,* 772 F.2d 700, 709 n. 9 (11th Cir.1985); *Sierra Club v. Morton,* 510 F.2d 813, 818 (5th Cir.1975).

Accordingly, the plaintiffs in this action bear the burden of demonstrating to the Court that the Corps' decision to grant the permit to the City was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law.

### B. Consideration of Extra–Record Materials

#### 1. Applicable Standard

The standard of review having been set forth above, the Court must now examine the proper scope of its review of the Corps' permitting decision. The plaintiffs have sought to introduce several exhibits which were not included in the original administrative record of this case. Additionally, at the trial on the merits, the defendants presented extra-record testimony from three different witnesses. The Court also notes that the administrative "record" submitted by the Corps contains a number of documents created after the permit had already issued. *See* Admin.Record, at tabs 125–150. Technically, such post-permit documents are not part of the official administrative record on review of the agency's decision. *See Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246–47 n. 2 (11th Cir.1996) (noting that administrative record consists only of documents considered by staff prior to agency action).

The Supreme Court has held that the "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *see also Cobb's History*, 87 F.3d at 1246; *Town of Norfolk v. U.S. Army Corps of Engineers*, 968 F.2d 1438, 1458–59 (1st Cir.1992). Although there are exceptions to this general rule, the Eleventh Circuit has recognized that a reviewing court may go beyond the administrative record only where:

"(1) an agency's failure to explain its action effectively frustrates judicial review; (2) it appears that the agency relied on materials not included in the record; (3) technical terms or complex subjects need to be explained; or (4) there is a strong

showing of agency bad faith or improper behavior." *Cobb's History*, 87 F.3d at 1246 n. 1 (citing *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436–37 (9th Cir. 1988)).

Although not specifically recognized by the Eleventh Circuit, two other exceptions to the prohibition on extra-record materials have been recognized by various appellate courts. The first of these exceptions allows courts to consider matters outside the administrative record where a plaintiff alleges that the agency failed to discuss adequately some reasonable alternative or "swept stubborn problems or serious criticism under the rug." *National Audubon Society v. U.S. Forest Service*, 46 F.3d 1437, 1447 (9th Cir.1993); *County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368, 1384–85 (2d Cir.1977). The second additional exception identified by the plaintiffs allows extra-record information to be considered by a reviewing court where such information takes the form of newly discovered evidence which undermines the soundness of the agency's decision. *See United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1429 (6th Cir.1991) (finding that "sound principles of justice cannot allow a reviewing court to close its eyes and ears to the new evidence"). The Eleventh Circuit has not yet commented on the validity of either of these exceptions; nonetheless, the Court will consider the applicability of those exceptions in this matter, pursuant to the above-cited authorities.

#### 2. Extra–Record Material Offered by Plaintiffs

The extra-record evidence offered by the plaintiffs includes post-decision statements by Mayor Dow and by City council members regarding the availability of other alternatives to the City's third proposal, an affidavit by Dr. George F. Crozier criticizing the Corps' data collection efforts, and various post-decision items of correspondence from the EPA and the Fish and Wildlife Service. The Court will examine each of these items in turn.

■ As stated in footnote 9, *supra*, the plaintiffs offered as exhibits the following post-decision statements: (1) a television re-

porter's statement attributing to Mayor Dow a comment that the City would do what it must to get the stadium built; (2) Mayor Dow's comments on a talk radio show that other alternatives had been available to the City; and (3) two City council members' remarks that additional upland acreage could probably be obtained from the property owners if this Court were to enjoin the City from filling in the 7.4 acres of wetlands on the McGowin tract. The Court does not believe that any of the four *Cobb's History* factors apply to these exhibits.[13] Nonetheless, the Court finds it appropriate to expand the administrative record to consider these statements, pursuant to the newly discovered evidence exception set forth in *Akzo Coatings*.

■ The plaintiffs have also submitted an affidavit by Dr. George F. Crozier, Executive Director of the Marine Environmental Sciences Consortium. *See* Exhibit K to Plaintiff's Motion for Preliminary Injunction. In his affidavit, Dr. Crozier asserts that the Corps should have performed a quantitative evaluation of the effects of the proposed wetlands fill-in on stormwater retention and treatment in the area, and that there is no data showing that the detrimental effects of the fill-in on the area's natural cleansing capacity would be insignificant. Dr. Crozier concluded that an Environmental Impact Statement should have been prepared to gauge the impact of the proposed wetlands destruction on the Dog River watershed. The *Cobb's History* factors are inapplicable to this exhibit. Though the plaintiffs apparently would invoke the "technical terms" exception, the Court is of the opinion that the subject matter at hand is not so technical, complex, or arcane as to compel expert assistance to the Court. Likewise, the newly discovered evidence exception and the *National Audubon* "failure to consider alternatives" exception cannot avail the plaintiffs with respect to Dr. Crozier's affidavit. Though Dr. Crozier avers that the Corps

should have done more than it did, the bare allegation that the Corps could and should have gathered more data is not a viable reason for deviating from the administrative record in this case. Accordingly, the Court will not consider Dr. Crozier's affidavit in its review of the Corps' permitting decision.

■ Finally, the plaintiffs seek to rely on post-decision letters to the Corps from both the EPA and the Fish and Wildlife Service. *See* Exhibits B and D to Plaintiffs' Motion for Preliminary Injunction. In these letters, both agencies criticized the Corps' decision to issue the permit, and reiterated the concerns which they had previously articulated in expressing their opposition to the City's previous proposals. The EPA suggested that the Corps had not acted in good faith in issuing the permit without waiting for comment by that agency. *See* Exhibit B. Additionally, the Fish and Wildlife Service protested that the Corps had never responded to concerns raised by that agency in its earlier letters and that the Corps had completely failed to coordinate communication among the various agencies. *See* Exhibit D. Under the circumstances, the Court finds that these letters may be considered in its review of the Corps decision pursuant to both the strong showing of bad faith exception and the *National Audubon* exception which applies where serious criticisms are "swept under the rug". Therefore, the Court will allow the plaintiffs to supplement the administrative record with the two post-decision letters submitted to the Corps by the EPA and the Fish and Wildlife Service.

### 3. Extra–Record Material Offered by Defendants

■ The defendants also relied on extra-record evidence at the trial on the merits. This evidence took the form of testimony from three witnesses. The first of these

---

13. The plaintiffs argued that these statements fall under the "bad faith" exception identified in *Cobb's History*. The Court disagrees. The fact that various City officials suggested post-permit that additional lands could have been obtained from the land owners can in no way be construed as a "strong showing" of bad faith on the part of the Corps in granting the permit. Stated

differently, there is no evidence that the Corps had any knowledge pre-permit of any such statements by City officials or of the existence of any such viable alternatives; therefore, while the statements at issue could conceivably support a claim of bad faith on the part of the City, they are not evidence that the Corps acted in bad faith by granting the permit to the City.

witnesses, Dr. Barry Vittor, testified regarding the anticipated cost and likelihood of success of any wetlands restoration efforts which might be conducted on the baseball stadium site at a later date. The remaining witnesses, John Bell and Clifton Lambert, were questioned about the timetable of the project and the feasibility of constructing a multi-tiered parking deck in lieu of the ground-level lot which would be built, in part, on the wetlands. Dr. Vittor's testimony goes to the irreparability of the harm suffered by the plaintiffs, rather than to the correctness of the Corps' decision to grant the permit.[14] Accordingly, that evidence will be considered by the Court. Similarly, the testimony of Bell and Lambert relating to the schedule of the project and the potentially disastrous consequences to the City of delaying the construction process relate to the potential harm to the City of delaying or altering the project. As such testimony does not go to the propriety of the Corps' administrative actions, the Court will consider it.[15]

■ Bell and Lambert's testimony concerning the potential costs and feasibility of a parking deck is on shakier footing than the other extra-record evidence offered by the defendants. Indeed, the defendants offered this evidence regarding the exorbitant expense of a parking garage to show that the parking deck alternative to the chosen plan was not practicable. While none of the *Cobb's History* factors are implicated by this evidence, the Court is of the opinion that it is amenable to consideration under the "failure to consider alternatives" exception set forth in *National Audubon*. Where, as here, the plaintiffs have alleged that the agency failed to consider reasonable alternatives, *National Audubon* indicates that the parties should be able to supplement the administrative record with additional evidence regarding those alternatives. Certainly, the plaintiffs could

have relied on *National Audubon* to present extra-record materials demonstrating the practicability of various alternatives which the Corps did not consider in the administrative record. Thus, the defendants must be permitted to present extra-record evidence showing that a particular alternative championed by the plaintiffs was not, in fact, practicable or reasonable, and therefore was not considered by the agency. In light of this analysis, the Court will weigh Bell and Lambert's parking deck testimony in its review of the Corps' decision to grant the permit.

## C. Standing of Plaintiffs to Bring this Action

■ Before reaching the merits of the plaintiffs' claims for injunctive and declaratory relief, the Court must consider whether the plaintiffs possess standing to bring those claims in the first place. In order to possess standing to invoke the power of federal court, a plaintiff must satisfy the following three constitutional requirements:

"First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical".' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.' Third, it must be 'likely', as opposed to merely 'speculative', that the injury will be 'redressed by a favorable decision'." *Region 8 Forest Service Timber Purchasers Council v. Alcock,* 993 F.2d 800, 805 (11th Cir.1993) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).[16]

14. Irreparable harm is an element which the plaintiffs must establish in order to prevail in their quest for permanent injunctive relief. *See* discussion at section II.D., *infra.* This element is distinct from the requirement that plaintiffs show that the Corps' decision was arbitrary and capricious.

15. Although the Court will consider Bell and Lambert's testimony on this front, such evidence

will be given negligible weight, as the degree of harm to the defendant is not a factor which the Court must examine in determining whether to grant permanent (as opposed to preliminary) injunctive relief. *See* discussion at section II.D., *infra.*

16. In addition to the three constitutional requirements, the plaintiffs must comport with three prudential limits on standing, namely: (1) the

There appearing to be no dispute that plaintiffs are capable of satisfying the second and third constitutional requirements recited by the *Region 8* court, this analysis will focus on the nature and extent of the injury suffered by the plaintiffs. The Supreme Court in *Lujan* elaborated on the injury in fact criterion by stating that "a plaintiff raising only a generally available grievance" who claims harm "to his and every citizen's interest" and who seeks relief that "no more directly and tangibly benefits him than it does the public at large" has not satisfied the injury in fact requirement. *See Lujan*, 119 L.Ed.2d at 372. Stated differently, a plaintiff must show that the challenged conduct has caused or will imminently cause demonstrable particularized injury to him such that he will benefit personally in a tangible way from court action. *See Cone Corp. v. Florida Dep't of Transportation*, 921 F.2d 1190, 1204 (11th Cir.1991) (citing *Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 2210 (1975)). In order to show an injury in fact, a plaintiff need not make any showing as to the magnitude of the injury suffered, and may satisfy the requirement by merely establishing that an "identifiable trifle" of an injury has been or will imminently be incurred as a result of the challenged conduct. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973). The critical distinction is between a person with a direct stake in the litigation and a person with a mere interest in a problem. *See id.*

In their complaint, each of the three plaintiff organizations characterizes itself and its members in the following fashion:

> The Plaintiff and its members have been involved for years with helping the Defendants increase protection of Alabama's environment, wetlands, and public health. Plaintiff's members regularly use and enjoy the environment, waters, wetlands, air and lands of Alabama, including Dog River, the lands in the Dog River Basin, and the benefits from the wetlands on this site. Plaintiff's members recreate in Alabama and enjoy the biological diversity of this beautiful site. Complaint, at ¶ 7.

Additionally, specific plaintiffs allege that their members engage in various activities, such as fishing and bird watching, in Dog River and in Mobile Bay, and that their ability to enjoy those activities will be impaired by the destruction of the wetlands at issue in this litigation.

To bolster their claims further, three individual members of plaintiff organizations have submitted affidavits to the Court explaining how they are benefited by the wetlands at issue, and how they would be harmed by their elimination. Margie Welch, Chair of the Alabama Chapter of the Sierra Club, filed an affidavit in which she states that she and many other Sierra Club members live on Dog River or in the Dog River basin, that they use Dog River for canoeing,

---

plaintiffs must assert only their own rights and interests; (2) the action must not involve "abstract questions of wide public significance"; and (3) the plaintiff's complaint must fall within the "zone of interests" sought to be protected by the statute in question. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982); *Region 8*, 993 F.2d at 805. There are also certain additional requirements which are imposed upon voluntary membership organizations which seek standing to sue on behalf of their members, namely: (1) the members must otherwise have standing to sue in their own right; (2) the organizations must be seeking to protect interests germane to their purposes; and (3) the participation of individual members must not be required. *See Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

The existence of these requirements notwithstanding, the defendants do not contend that any of the prudential or voluntary membership organization requirements have not been met by the plaintiffs. Rather, the full force of the defendants' standing arguments is devoted to a discussion of the plaintiffs' compliance with the constitutional factors. Despite the defendants' failure to raise these issues, the Court performed an independent analysis of the applicability of prudential and voluntary membership criteria in this case. Pursuant to this analysis (which is not set forth here, as the defendants never raised the issue), the Court is of the opinion that such requirements have indeed been satisfied in this case. Therefore, the defendants' standing objections rise or fall with the merits of their constitutional arguments, as set forth above.

hiking, boating, and fishing, and that they drive by the impacted wetlands and enjoy their aesthetic beauty. Ms. Welch further avers that the filling in of the wetlands at issue here will further degrade the water quality, destroy the aesthetic beauty of the site, diminish the quality of life for herself and other members of her organization, and otherwise directly affect them. In a second affidavit, Myrt Jones of the Mobile Bay Audubon Society alleges that many organization members live on or near Dog River, and enjoy skiing, birdwatching, boating, and observing the serene beauty of the impacted wetlands. A third affidavit was filed by Cherie Marceaux of the Native Forest Network, who asserts that she and other members of her organization engage in such activities as canoeing, kayaking, photography, and daydreaming on and alongside the Dog River. Ms. Marceaux also asserts that she and other members of her organization enjoy cycling alongside the wetlands which would be impacted by the stadium complex, and that the proposed fill-in site is "magical and beautiful" for its various flora and fauna. In short, Ms. Marceaux contends, she "love[s]" the wetlands which are at issue in this litigation.

The allegations presented in both the complaint and in the affidavits filed by individual members of the plaintiff organizations are sufficient, as a matter of law, to satisfy the injury in fact requirement for standing. The plaintiffs have alleged that they engage in various activities in Dog River and in the Dog River basin which will be curtailed or otherwise be adversely affected by the proposed wetlands fill-in. They have further contended that they derive aesthetic enjoyment from the site itself, that they have studied the wildlife on the site from nearby locations, and that their ability to engage in these pastimes will be directly and tangibly affected by the destruction of the wetlands in question.[17] Though the injury is small in that the impact of the wetlands fill on recreation in the Dog River will undoubtedly be slight, it is sufficient to create an injury in fact. The case law is abundantly clear that a minimal showing of detriment is all that is required to establish an injury in fact, and that the plaintiffs' demonstration of an injury in fact in this case is more than adequate to establish standing to sue. *See, e.g., Japan Whaling Association v. American Cetacean Society,* 478 U.S. 221, 231 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (holding that plaintiff whale watchers alleged sufficient injury in fact by asserting that their ability to engage in whale watching activities would be adversely affected by continued whale harvesting activities of the defendant).[18] Accordingly, the Court hereby rejects the de-

---

**17.** The defendants have responded that the activities recited by the defendants are not sufficient to establish standing. For instance, they argue that drive-by viewing of the wetlands along an interstate is insufficient to establish standing, that Ms. Marceaux could not legally engage in cycling activity in the affected area, and that the various plaintiff recreational activities along Dog River will be wholly unaffected by the fill-in of 7.4 acres of wetlands for the stadium project. Thus, the defendants are challenging the factual veracity of the affidavits filed by the plaintiffs.

The Court is unwilling to embark on an in-depth inquiry as to each of the factual statements presented in the various affidavits. More to the point, no such inquiry is necessary. Indeed, the defendants' standing argument effectively asks the Court to grant summary judgment to the defendants on standing grounds. Where an attack on standing is brought via a motion for summary judgment, the specific facts set forth by the plaintiffs in their affidavits must be accepted as true. *See Region 8,* 993 F.2d at 806 (citing *Lujan,* 504 U.S. at 561–62, 112 S.Ct. at 2137). Therefore, notwithstanding the factual disputes raised by the defendants, the Court accepts the allegations in the plaintiffs' affidavits as true for the purposes of the standing challenge raised by defendants. Parenthetically, the Court notes that it would be ill-equipped at this time to resolve the factual disputes raised by the defendant for the simple reason that no testimony regarding such issues was offered by any of the parties at trial.

**18.** Numerous other cases have found an injury in fact based on allegations similar to those presented in this case and in *Japan Whaling. See Save Our Community v. U.S.E.P.A.,* 971 F.2d 1155, 1161 (5th Cir.1992) (organization members who enjoyed wildlife, aesthetic, and other values of wetlands sufficiently stated injury in fact); *Sierra Club v. Simkins Industries, Inc.,* 847 F.2d 1109 (4th Cir.1988) (finding injury in fact based on environmental and aesthetic interests of organization member who hiked along polluted river); *Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57, 61 (2d Cir.1985) (finding that injury in fact had been adequately alleged where organization members recreated on river and found pollution aesthetically displeasing).

fendants' argument that the plaintiffs have not sufficiently alleged an injury in fact in this case.[19] As no other standing challenges have been raised by defendants, the Court further concludes that the plaintiff organizations possess the requisite standing to pursue this action in federal court.

Before leaving the standing issue, the Court must visit the defendants' argument that the plaintiffs have alleged "procedural injuries" which they do not have standing to pursue. Specifically, the defendants argue that the plaintiffs have alleged that the Corps' failure to follow proper procedures with respect to public notice and comment from the EPA and the Fish and Wildlife Service, in and of itself, worked a harm upon the plaintiffs. The Court disagrees with this characterization of plaintiffs' allegations of injury. Nowhere in the complaint or the supporting affidavits do the plaintiffs allege an injury based strictly on the Corps' failure to follow proper procedures. Rather, the plaintiffs allege environmental and aesthetic losses which, they claim, would not have been sustained had the proper procedures been followed. Thus, it is not the procedures themselves, but the effect of the Corps' alleged divergence from such procedures, with which the plaintiffs take issue in this action. In that respect, this case is quite different from *Region 8*, in which the plaintiffs alleged that government agencies' failure to follow proper procedures injured their rights to information, participation, and informed deci-

sion making. *Region 8*, 993 F.2d at 810; *see also Lujan*, 119 L.Ed.2d at 372 (holding that claim of procedural injury merely states generalized grievance about government and does not establish a case or controversy).[20]

*D. Permanent Injunction Standard*

Although the proceeding before the Court on August 19, 1996 was scheduled as a hearing on plaintiffs' motion for preliminary injunction, the plaintiffs asked the Court at that hearing to transform it into a trial on the merits. Accordingly, the issue before the Court is not whether a preliminary injunction should issue, but rather whether the plaintiffs are entitled to permanent injunctive relief in this matter.

▮ The standard for issuance of a permanent injunction is essentially the same as that for the issuance of a preliminary injunction, except that a plaintiff seeking the former relief must show actual success on the merits, rather than a mere likelihood of success on the merits.[21] *See Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 392, 101 S.Ct. 1830, 1832, 68 L.Ed.2d 175 (1981)). In order to be entitled to permanent injunctive relief, the plaintiffs must satisfy the following three criteria: (1) violation of the applicable statutory or regulatory authority by the defendants; (2) continuing irreparable injury to

19. Defendants' protestations to the contrary are lacking in merit. In their brief, defendants suggest that the plaintiffs cannot have standing because there is no direct access to the privately owned wetlands at issue in this case. However, this argument ignores the fact that the plaintiffs are alleging that they will suffer direct repercussions on Dog River and in the Dog River basin resulting from the destruction of those wetlands. Defendants' argument is also undercut by the fact that the plaintiffs have alleged that they view the aesthetic beauty of the wetlands in question on a regular basis, and that at least one member of a plaintiff organization claims to ride her bicycle alongside the land at issue and enjoy the wildlife living thereon during such sojourns. Given the plaintiffs' direct involvement with these specific acres of wetlands and the surrounding ecosystem, the Court cannot agree with defendants' assertion that the plaintiffs have alleged a mere interest in a problem, rather than a concrete, particularized injury to themselves.

20. Indeed, the *Region 8* court expressly observed that "[t]his is not a case where the failure to follow a mandated procedure caused a distinct injury, different from that suffered by the public generally." *Region 8*, 993 F.2d at 810 n. 16. By contrast, this is such a case; therefore, defendants' reliance on *Region 8* in this regard is misplaced.

21. Another difference is that a court facing a motion for preliminary injunction weighs the potential harm to the defendant resulting from an injunction, while a court deciding whether to grant permanent injunctive relief does not do so. This divergence may be explained by the fact that a permanent injunction is awarded against a defendant who has been found to have violated a statute or regulation, while a preliminary injunction is awarded against a party found likely to have done so.

the plaintiffs in the absence of an injunction; and (3) lack of an adequate remedy at law. *See Newman v. State of Alabama*, 683 F.2d 1312, 1319 (11th Cir.1982); *Lopez v. Garriga*, 917 F.2d 63, 67–68 (1st Cir.1990); *Environmental Waste Reductions, Inc. v. Reheis*, 887 F.Supp. 1534, 1570 (N.D.Ga.1994); *Diamond Waste, Inc. v. Monroe County, Georgia*, 869 F.Supp. 944, 947 (M.D.Ga.1994). In their briefs and oral arguments, the defendants have focused their attention on the first and second of these elements; therefore, the Court's analysis will be devoted exclusively to assessment of those elements.

### E. Plaintiffs' Ability to Succeed on the Merits

The plaintiffs attribute two types of wrongdoing to the Corps in its permitting decision. First, they contend that the Corps failed to consider other reasonable and practicable alternatives to the selected project design, in violation of the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and the Administrative Procedure Act ("APA"). Second, the plaintiffs attack the procedural mechanism through which the permit was issued, inasmuch as neither the public nor various federal agencies were afforded an adequate, meaningful opportunity to respond to the City's third proposal for the baseball stadium complex design and location. With respect to the latter claim, the plaintiffs allege that the Corps' hasty issuance of the permit without allowing comment violated their responsibilities under the Fish and Wildlife Coordination Act ("FWCA"), NEPA, the CWA, and the APA. In response, the Corps denies that its actions ran afoul of the applicable statutes and regulations. The Corps also suggests that the procedural requirements cited by the plaintiffs are immaterial in this case, because the Corps could have issued a so-called Nationwide Permit number 26 to the City, which permit could have been issued without any of the elaborate procedures identified and relied upon by the plaintiffs. The Court will consider each of these issues in turn.

### 1. Failure to Consider Alternative Sites

#### a. Standard of Review of NEPA Documents

The Corps' authority to issue permits to fill wetlands derives from Section 404 of the Clean Water Act, codified at 33 U.S.C. § 1344(a). Under the applicable Section 404 guidelines, "no discharge of dredged or fill material shall be permitted if there is a *practicable alternative* to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a) (emphasis added); *see also Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 542 (11th Cir.1996); *see generally Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 995 (9th Cir.1993). The regulations further provide that an alternative is considered "practicable" if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2); *see also Fund for Animals*, 85 F.3d at 542. Where an activity would involve destruction of wetlands and where said activity is not "water dependent", the regulations create a presumption that practicable alternatives not involving wetlands are available, unless clearly demonstrated otherwise. *See* 40 C.F.R. § 230.10(a)(3); *see also Fund for Animals*, 85 F.3d at 542. If a permit application complies with the Section 404(b) regulations, the Corps must issue it unless the district engineer finds that such issuance would be "contrary to the public interest." 33 C.F.R. § 320.4(a)(1).

The degree of scrutiny which the Corps must apply to these alternatives depends on whether the agency is required to produce an environmental impact statement, as opposed to merely an environmental assessment. NEPA requires that agencies prepare environmental impact statements for all "major federal actions significantly affecting the quality of the human environment." [22]

---

22. Under NEPA, a court's role in reviewing an agency's decision is to ensure that the agency took a "hard look" at the environmental consequences of the proposed action and its alternatives prior to issuing its decision. *See Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 546–47 (11th

42 U.S.C. § 4332(2)(C)(i). In determining whether an environmental impact statement ("EIS") is necessary in a particular case, federal agencies must first prepare an environmental assessment ("EA") which provides sufficient evidence and analysis for a determination of whether an EIS should be prepared, and which includes brief discussions of environmental impacts of proposed action and alternatives.[23] *See* 40 C.F.R. §§ 1501.4(a), 1508.9. The purpose of the EA is to determine whether the likelihood of significant environmental harm is sufficiently great to warrant the significant investment of time and expense required to produce an EIS. *See Fund for Animals*, 85 F.3d at 546 (citing *River Road Alliance, Inc. v. Corps of Engineers of U.S. Army*, 764 F.2d 445, 449 (7th Cir.1985)). In this case, the Corps' EA found that the instant project was not a "major federal action significantly affecting the quality of the human environment" and that no EIS was necessary. Though the plaintiffs have argued that an EIS should have been prepared, there is no evidence in the record to support their allegation that the finding of no significant impact was arbitrary or capricious.[24] In that respect, this action rests on a similar footing to *Preserve Endangered Areas of Cobb's History, Inc. v.*

*U.S. Army Corps of Engineers*, 87 F.3d 1242 (11th Cir.1996), in which the Eleventh Circuit held:

> "Although the plaintiffs disagree with the conclusion of the Corps, they can point to nothing that would make the Corps decision arbitrary and capricious. The Corps considered the impact on the wetlands, considered the [City]'s mitigation plan, and reasonably concluded that the impact on the wetlands would not be significant." *Id.* at 1248.

▆▆▆ Accordingly, the Corps' obligations under NEPA were not to present a detailed EIS, but merely to "study, develop, and describe appropriate alternatives to recommended courses of action" pursuant to an EA. 42 U.S.C. § 4332(2)(E); *see also Druid Hills Civic Ass'n v. Federal Highway Administration*, 772 F.2d 700, 713 (11th Cir. 1985) (noting that consideration need only be given to reasonable alternatives). As stated previously, the Corps is permitted to perform a less detailed analysis of the various alternatives in an EA than it would in an EIS. Furthermore, the Corps is free to consider a narrower range of alternatives where no significant environmental impact is found than it

Cir.1996) (observing that Court's role is to examine whether NEPA procedures have been followed, not to interject itself into the area of discretion of the agency); *Druid Hills*, 772 F.2d at 709 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976)).

23. The major distinction between an EA and an EIS lies in the level of detail required. An EA contains merely a brief discussion of the need for the underlying project, the need for the project to impact wetlands, the alternatives available, the environmental impacts of the proposed action and viable alternatives, and a listing of the agencies and persons consulted by the Corps. *See* 40 C.F.R. § 1508.9(b). Meanwhile, an EIS is a "detailed written statement" describing the environmental impact of the proposal, adverse effects which cannot be avoided if the proposal is implemented, alternatives to the proposed action, the short-term and long-term uses and productivity of the land at issue, and any irreversible commitments of resources which would be involved if the proposed action were taken. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11. Where an EIS is required, the agency must "rigorously explore and objectively evaluate all reasonable

alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). The preparation of an EA is a precursor to the preparation of an EIS.

24. Plaintiffs' primary evidence regarding the correctness of the Corps' decision not to issue an EIS was the affidavit from Dr. Crozier. In that document, Dr. Crozier suggested that there was insufficient evidence in the record from which the Corps could have reached its conclusion that the environmental impact of the proposed wetlands fill would be insignificant. *See* Exhibit K to Plaintiff's Motion for Preliminary Injunction. However, the Court has held that this affidavit is extra-record material which does not fall under any of the applicable exceptions to the ban on evidence not in the administrative record; therefore, it will not be considered. Even if the Court were to consider Dr. Crozier's affidavit, the Court is of the opinion that there is sufficient evidence in the record supporting the Corps' finding of no significant environmental impact. In short, Dr. Crozier's affidavit does not affect the Court's conclusion. Neither the finding of no significant environmental impact nor the concomitant decision not to produce an EIS can be characterized as arbitrary or capricious.

would otherwise, as the range of alternatives which need be considered is directly proportional to the environmental impact of the proposed action. *See Friends of the Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1558 (2d Cir.1992); *Sierra Club v. Espy*, 38 F.3d 792, 796 (5th Cir.1994). In general, the agency need only adhere to a "rule of reason" both in deciding which alternatives to consider and in determining the extent to which it must discuss them in NEPA documents. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195–96 (D.C.Cir. 1991) (agency discussion of alternatives upheld so long as alternatives are reasonable and agency discusses them in reasonable detail). Under NEPA, the party challenging the agency's decision shoulders the burden of proving that the scope or extent of the agency's discussion of alternatives was unreasonable. *See Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir.1988) (quoting *Park County Resource Council, Inc. v. United States Department of Agriculture*, 817 F.2d 609, 621 (10th Cir.1987)).

### b. Parking Deck Alternative

The plaintiffs allege that the Corps failed to adhere to the mandates of CWA and NEPA in considering potential alternative sites for the stadium project, including both available alternatives on other tracts of land as well as other locations on the McGowin tract itself. Plaintiffs further contend that the Corps' alleged deviance from applicable statutes and regulations rendered its decision to issue the permit to the City "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", and that the APA mandates that this Court therefore hold unlawful and set aside such agency action. 5 U.S.C. § 706(2)(A). In particular, the plaintiffs point to two alternative plans which, in their view, the Corps failed to consider fully prior to issuing the permit to the City. The Court's inquiry here focuses

in the first instance on whether such alternatives were practicable and, if so, whether the degree of scrutiny accorded those alternatives in the EA was sufficiently reasonable to comport with the applicable statutory and regulatory authorities.

First, the plaintiffs argue that the Corps erred in failing to consider the possibility of constructing a multi-tiered parking deck structure for approximately 1,000 parking spaces on available uplands, rather than building a ground-level conventional parking lot for said 1,000 parking spaces on the 7.4 acres of wetlands which the City sought permission to fill. The plaintiffs contend that the parking deck notion was a viable alternative which would have allowed the City to complete its stadium complex without implicating any wetlands whatsoever. The Corps has conceded that it never considered this parking deck option; indeed, the administrative record does not contain a shred of evidence regarding the feasibility of such an alternative plan. There is simply no reference anywhere in the administrative record to the alternate plan of avoiding the wetlands by building an elevated parking structure on nearby uplands rather than a conventional lot on the wetlands.

■ Despite these omissions, the Corps' failure to assess and evaluate this alternative does not necessarily imply that the Corps violated CWA and NEPA. As stated previously, the applicable regulations are clear that the Corps need only consider "practicable" or "reasonable" alternatives.[25] Moreover, the case law is clear that an EA or EIS "cannot be found wanting simply because the agency failed to include every device and thought conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978).[26] The concept of alter-

---

25. As set forth in section II.E.1.a., *supra*, the Court must apply a "practicable" standard under the CWA and a "reasonable" standard for the purposes of NEPA. As the plaintiffs have alleged that the Corps' failure to consider alternatives violated both statutes, the Court must consider both standards, despite the confusion which results from applying these two slightly differing standards simultaneously.

26. Numerous appellate decisions have followed *Vermont Yankee*'s lead on this issue. *See, e.g., Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432 (10th Cir.1996) (agency's failure to consider unfeasible alternatives does not

natives has been held to be an evolving one, such that agencies may be required to consider more or fewer alternatives as they become better known and understood. *See id.* at 552–53.

In challenging the Corps' failure to consider the parking deck option, the plaintiffs bear the burden of establishing that this alternative to the proposal approved by the Corps was reasonable or practicable. *See Sierra Club v. Hodel,* 848 F.2d 1068, 1089 (10th Cir.1988). At trial, however, the plaintiffs never presented any evidence or testimony regarding the feasibility, reasonableness, or practicability of constructing a multi-level parking deck structure on uplands in the 30 acre parcel donated by the private land owners. By contrast, the defendants presented testimony from two witnesses regarding the parking deck issue. One witness, City Director of Public Services John Bell ("Bell"), testified that if the City were denied its application to fill the 7.4 acres of wetlands at the site, approximately 1,000 parking spaces would be lost through direct and indirect means. While the City could conceivably construct a multideck parking facility on that site for the remaining spaces, Bell testified, such a facility would cost approximately nine to ten thousand dollars per parking space, leading to a total estimated cost of $9 to $10 million for an elevated parking facility at the stadium complex. Bell also testified that the City's entire budget for the entire stadium project (including ball park, parking lot, etc.) was a mere $7.2 million. Bell expressed serious concerns about the logistical feasibility of placing an elevated parking garage on the stadium site, as he noted that the access road and retention pond would need to be relocated, and that the construction contract would need to be renegotiated by the City at substantial delay and expense. Finally, he testified that the construction contract is currently "out for bids" and bids are due to be accepted by the City on August 27, 1996; and further that the contract proposal has no severability clause in it which would allow the City to award the contract without the 7.4 acres of parking if the Court were to issue the injunction requested by the Plaintiffs. A second defense witness, construction manager Clifton Lambert ("Lambert"), testified that it was unclear where a multi-level parking deck structure could be built on the site which has been donated by the land owners. Additionally, Lambert estimated the cost of an elevated parking deck at $8,500 per parking space, which translates into a total cost of $8.5 million for construction of such a structure.[27]

The plaintiffs have made no effort either before, during, or after trial to demonstrate that the parking deck was, in fact, a workable alternative to the parking lot presently planned for the baseball stadium complex. Rather, the plaintiffs attempt to persuade the Court that the Corps and the City are simply offering *post hoc* rationalizations for their failure to consider the parking deck issue prior to issuance of the permit. Appar-

violate NEPA because agency need not consider alternatives which it has in good faith rejected as too remote, speculative, impractical, or ineffective); *Laguna Greenbelt, Inc. v. U.S. Department of Transportation,* 42 F.3d 517, 524–25 (9th Cir. 1994) (noting that the concept of alternatives under NEPA is bounded by some notion of feasibility of those alternatives and that agency need not consider every conceivable alternative nor remote and speculative alternatives); *Resources Ltd., Inc. v. Robertson,* 35 F.3d 1300, 1307 (9th Cir.1993) (agency may fix parameters and criteria for generating alternatives so as to avoid consideration of countless alternatives); *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C.Cir.1991) (agency need not consider infinitely large number of alternatives which could accomplish goals set in a particular project, as doing so would cause project to collapse under the sheer weight of the possibilities).

27. Both witnesses also indicated that it would be impossible simply to reduce the number of parking spaces at the baseball stadium by 1,000. Bell testified that, at the present time, there are 2,100 planned parking spaces for the 8,000–seat baseball stadium. Additionally, Lambert asserted that restrictions on the extent to which the number of parking places may be reduced are imposed both by City ordinances and by Southern League requirements regarding the number of parking spaces at League facilities. Lambert further testified that the City has already been required to seek and obtain consent from the League to lower the number of spaces from the 2,600 originally mandated by the League to the 2,100 spaces presently contemplated for the stadium complex. From Lambert's testimony, it appears that further reductions in the number of parking spaces would not be feasible.

ently, plaintiffs would have the Corps examine every conceivable alternative to a proposal in an on-the-record fashion, then articulate explanations for its determinations that certain of those alternatives are not practicable or reasonable. This is not the law. Indeed, the CWA regulations state that a permit can only be issued if there is no "practicable" alternative with a lesser environmental impact. The defendants presented persuasive, unrebutted evidence that construction of a parking deck on the stadium site was not practicable on the basis of both cost and logistics. Likewise, NEPA requires merely that the agency consider and evaluate "reasonable" alternatives in a reasonable manner. The defendants have shown, and the plaintiffs have not rebutted, that the parking deck was not a reasonable alternative; therefore, the Corps was not compelled under NEPA to consider it. Neither provision compels an agency to explain in the administrative record its determination that a patently unworkable alternative is unreasonable or impracticable before rejecting it from consideration.[28] In sum, the Court simply cannot conclude on the record before it that the Corps acted arbitrarily, capriciously, or unreasonably in failing to consider an alternative parking scheme which would have more than doubled the cost of the construction project and which would have posed substantial logistical problems for construction of the stadium complex on the lands donated by the property owners

on the McGowin tract. The plaintiffs have not met their burden of showing that the Corps' failure to study the parking deck possibility was unreasonable, and the Court will not set aside the Corps' decision based on the agency's lack of consideration of that alternative.[29]

### c. Additional Land Alternative

The plaintiffs also identify a second alternative which they contend the Corps did not consider adequately before issuing the permit. Specifically, the plaintiffs claim that the Corps should have examined the possibility of obtaining more uplands from the McGowin land owners. Had the City done so, the plaintiffs argue, they might have determined that the entire facility could have been constructed on uplands and that there was no necessity to fill any wetland acreage whatsoever. There is evidence in the administrative record which shows that this alternative was, in fact, considered by the Corps. In particular, the Corps had before it a letter dated May 24, 1996, which was written by Mayor Dow. In this letter, Mayor Dow advised the Corps that "in [the City's] discussions and the negotiations with the property owners they have stated emphatically and finally, that there is no more property available on their 180 area [sic] tract of land that they would make available for the stadium site."[30]

---

**28.** If either NEPA or the CWA did require such an exposition by the agency, the Court can only speculate on how much more voluminous and unwieldy the administrative record in this case would be than the three volumes and 817 pages which it currently fills.

**29.** In one of their briefs and at oral argument, the defendants asserted that the plaintiffs' parking deck alternative should be discredited because the plaintiffs had never presented such an alternative to the Corps prior to the permitting decision being made. The Court does not agree that the plaintiffs' failure to raise the alternative prior to the permit being issued automatically renders the plaintiffs unable to raise it now. Indeed, the plaintiffs alleged that the parking deck only became an issue after the May 24, 1996 plan was revealed, as this third plan was the first to move the stadium itself off the wetlands and to place just part of the parking lot in the wetlands at issue. Because the permit decision was made on May 28, 1996, the plaintiffs did not have sufficient time to comment meaningfully on this third proposal prior to the issuance of the permit. It would be unfair to bar them from raising that alternative now simply because they did not do so during the four day window after the third proposal was submitted by the City. Hence, to be clear, the Court is rejecting the parking deck alternative because there is no evidence that it was reasonable or practicable, not because the plaintiffs failed to present it to the Corps prior to the permit decision being made.

**30.** Mayor Dow's representations regarding the land owners' position do not constitute the only information which the Corps had regarding the owners' willingness to part with additional uplands for the stadium project. Indeed, an internal Corps document dated May 23, 1996 indicates that Corps representatives met with Mayor Dow and the land owners "several times" on May 22, 1996 to discuss the pending permit application by the City. Admin.Record, at tab 107. Though this document does not reflect the substance of those meetings in any great detail, it

Admin.Record, at tab 113. Mayor Dow also indicated that the land owners had stated that any such alteration of the lands made available for the stadium would disrupt their development plans for the parcel of land. *Id.*

Clearly, the Corps devoted some consideration to the prospect of securing additional uplands for the project or otherwise moving the complex within the McGowin tract. Indeed, the EA prepared by the Corps shows that the agency did examine these issues in some analytical detail. In that document, the Corps expressly asserts practical and logistical reasons why the stadium could not be moved from its proposed location in the southwest corner of the acreage to the north, east, or southeast, and makes reference to Mayor Dow's May 24 letter. Admin.Record, at p. 00756.

Thus, the Corps did consider the possibility of obtaining additional or alternate land on the McGowin tract. The plaintiffs take issue not with the Corps' decision to consider this alternative, but with the extent of the Corps' consideration of it. In particular, they suggest that the Corps was wrong to rely on the land owners' representations about availability of additional lands. To support their claims, the plaintiffs point to a May 8, 1996 letter in which the land owners' representative informed the City that the owners were unwilling to make any additional or alternative lands available for the construction project. Admin.Record, at tab 81. The May 8 letter notwithstanding, the plaintiffs observe, the land owners made more than 9 acres of additional uplands available to the City two weeks later, as evidenced by the City's unveiling of the a new plan on May 23, 1996, which plan would impact only 7.4 acres of wetlands rather than the 16.9 acres previously contemplated. Because the land owners

did not adhere to their vigorous assertions in their May 8 letter, plaintiffs argue, the land owners' representations to Mayor Dow as related to the Corps in his May 24 letter should have been deemed suspect, at best, by the Corps, and should not have been accepted at face value.[31] Plaintiffs further protest that the contents of Mayor Dow's letter, upon which the Corps relied, are unsupported hearsay, and argue that the Corps should have investigated further to ensure that the landowners truly were serious about their stated refusal to surrender any more upland territory to the baseball stadium construction project. In their brief, plaintiffs summarize their position by asserting that "the City and Corps should have tried harder" to determine the land owners' true intentions regarding the availability of additional lands. Plaintiffs' Reply Brief, at 9.

Furthermore, the plaintiffs point to post-decision, extra-record statements by Mayor Dow and by various City council members in which these officials suggested that other lands could be or would have been made available for construction of the baseball stadium. The plaintiffs presented as exhibits the following items: (1) a videotape containing a July 12, 1996 news broadcast in which the reporter ascribed to Mayor Dow a comment that the City would "do what it must" to finish the stadium, even at the cost of moving the parking lot or reducing the number of spaces; (2) a June 14, 1996 radio show transcript in which Mayor Dow stated that there were several ball park sites which the City "should have got"; and (3) a transcript of an August 6, 1996 City council meeting in which two council members suggested that additional upland acreage could be obtained if the City were enjoined from filling in the 7.4 acres of wetlands. *See* Exhibit J to Plaintiffs' Motion for Preliminary Injunction; Plaintiffs' Exhibits 1, 4; *see generally* de-

is likely that Corps officials would have taken advantage of their opportunity at the meetings to probe first-hand the landowners' willingness or unwillingness to donate additional uplands to the City for construction of the baseball complex.

31. In attempting to cast doubt on the land owners' statements to Mayor Dow, the plaintiffs also point out that the stadium project was originally scheduled to impact 40 acres of wetlands. Admin.Record at tab 1. Proceeding with this line of argument, the plaintiffs trace the gradual de-

cline of wetland acreage contemplated by the proposal throughout the permitting process, as the amount of wetlands impacted fell from 40 acres to 28.45 acres to 19.6 acres to 16.6 acres to 7.4 acres. Apparently, the plaintiffs' reasoning is that if the landowners had been willing to replace wetlands with uplands in their proposed donation to the City on several occasions in the past, the Corps should not have taken seriously their May 24 assertion that no more uplands would be made available to the City for construction of the stadium complex.

scription of this evidence at section II.B.2., *supra.*

■ The Court finds that the Corps engaged in a reasonable analysis of the availability of uplands on the McGowin tract, and that its analysis was reasonably detailed. The evidence in the administrative record unambiguously pointed toward the conclusion that said lands were unavailable, and that alternative configurations within the 180 acre tract were not practicable. Certainly, the land owners had previously stated that no more lands were available, then subsequently swapped 9.5 acres of uplands for 9.5 acres of wetlands in the original proposal. While that fact may cast some cloud or suspicion on the veracity and credibility of their statements to Mayor Dow, the Court is of the opinion that that fact alone does not render it arbitrary and capricious for the Corps to have relied on Mayor Dow's letter in assessing the availability of other lands on the McGowin tract for the baseball stadium. Furthermore, the Court finds that the post-decision statements by Mayor Dow and the City council members are likewise wholly insufficient to allow the plaintiffs to meet their burden of showing by a preponderance of the evidence that the Corps' rejection of the alternative lands option was arbitrary and capricious or that the Corps failed to analyze with reasonable detail the feasibility of such an alternative.[32]

In light of the foregoing analysis, the Court declines plaintiffs' invitation to find unreasonableness or capriciousness on the Corps' part for failing to perform a more indepth inquiry into the availability of alternate lands on the McGowin tract, and for rejecting that alternative to the proposal for which the permit was ultimately issued. Plaintiffs are not entitled to relief on this basis.

■ Finally, the Court notes that, under 40 C.F.R. § 230.10(a)(3), where, as here, a wetlands fill permit application involves a prospective use of the land which is not water-dependent, the Corps is instructed to presume that practicable alternatives exist unless the party seeking the permit clearly demonstrates otherwise. *See id.* However, the Court's conclusion that the Corps' failure to consider adequately various alternatives does not rise to the level of arbitrary and capricious action is not undermined by this regulation. On the contrary, the Court finds that the City did present adequate evidence to demonstrate clearly that no practicable alternatives existed, and to overcome the presumption of practicable alternatives. Indeed, the City's submissions analyzed a myriad of other sites in light of certain clearly stated criteria, and determined that none of those alternate sites could satisfy all of the selection criteria. The plaintiffs have offered no evidence to show that a practicable alternative to that chosen by the defendants did in fact exist. Accordingly, the Court does not find it arbitrary or capricious of the Corps to conclude that the City's submissions were adequate to overcome the presumption against filling in wetlands for non-water-dependent uses. Stated differently, the plaintiffs' claims that the Corps failed to consider adequately various alternatives cannot be rescued by reliance on 40 C.F.R. § 230.10(a)(3).

### 2. Lack of Notice to Public and Federal Agencies

#### a. *Statutory and Regulatory Backdrop*

The plaintiffs' next claim is that the Corps erred by granting insufficient time for the

---

**32.** At trial, the plaintiffs declined to call the land owners or their representatives to inquire as to whether any additional uplands actually would or could have been made available by the land owners. Instead, the plaintiffs chose to rely solely on the post-decision statements recited above. These statements are of negligible evidentiary value. In the exhibits proffered by the plaintiffs, the City officials do *not* indicate that additional uplands were available, nor do they suggest that any City official was concealing information from the Corps or otherwise attempting to manipulate the permitting proceedings. Rather, the quotations relied upon by the plaintiffs merely reflect the fact that City officials were trying to

assuage residents' fears about whether the stadium would be constructed, and to speak in positive, upbeat terms about the prospects of having a AA ball park in Mobile. Moreover, all three statements are simply indicative of the City's determination to complete the project, regardless of the outcome of this lawsuit or the site on which the stadium is ultimately constructed. The plaintiffs' efforts to read some nefarious purpose into such innocuous, stray remarks intended to reassure the citizenry fall far short of meeting their burden of establishing by a preponderance of the evidence that the Corps' analysis of the available of additional lands was unreasonable in its brevity and lack of depth.

public and for the Fish and Wildlife Service and EPA to review and comment on the third proposed plan for the stadium and parking lot. In support of this cause of action, the plaintiffs point to the fact that the Corps faxed to the federal agencies pertinent information about the 7.4 acre plan on May 24, 1996 and on the morning of May 28, 1996, and that the Corps proceeded to issue the permit in the late morning of May 28, 1996 without waiting for any agency responses to be submitted. No public notice of the third proposed plan provided by the City was ever provided, and no public comments were ever submitted or received by the Corps as to this third permutation of the development scheme prior to the Corps' issuance of a permit to the City on May 28, 1996. The plaintiffs allege that these facts give rise to violations of various regulatory and statutory provisions, which allegations shall be considered below.

### b. Failure to Provide Notice to Federal Agencies

Under the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.*, prior to the commencement of any project which would cause the "waters of any stream or other body of water . . . to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States, or by any public or private agency under Federal permit or license, such department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior . . . ." 16 U.S.C. § 662(a). The involvement of the Fish and Wildlife Service is such that the reports and recommendations which it issues "shall be made an integral part of any report prepared or submitted by any agency of the Federal Government" which is required to consult with the Fish and Wildlife Service. 16 U.S.C. § 662(b). The stat-

ute also requires the agencies seeking consultation with the Fish and Wildlife Service to give full consideration to its reports and recommendations. *See id.* The Corps' governing regulations reflect cognizance of these responsibilities under the FWCA.[33]

■ On a procedural note, the FWCA does not include a citizen suit provision. Thus, there is no private right of action afforded plaintiffs by the FWCA directly. However, several courts have held that NEPA incorporates the FWCA, such that an agency which complies with NEPA has necessarily also complied with the FWCA. *See* 40 C.F.R. § 1502.25(a) (EIS prepared by agency must comply with FWCA); *Texas Committee on Natural Resources v. Marsh,* 736 F.2d 262, 267 (5th Cir.1984) (NEPA requires compliance with FWCA); *Environmental Defense Fund, Inc. v. Froehlke,* 473 F.2d 346 (8th Cir.1972) (holding that if the Corps complies with NEPA in good faith, it must automatically take into consideration its obligations under the FWCA); *Bergen County v. Dole,* 620 F.Supp. 1009, 1064 (D.C.N.J. 1985) (finding that agencies' compliance with NEPA automatically establishes compliance with FWCA). Therefore, the Court perceives the plaintiffs' invocation of the FWCA as a part of their claim that the defendants violated NEPA. *See Environmental Defense Fund, Inc. v. Alexander,* 501 F.Supp. 742, 767 (N.D.Miss.1980), *rev'd on other grounds,* 651 F.2d 983 (5th Cir.1981) (holding that "any separate claim that defendants are not complying with FWCA is merged with and subsumed by [the plaintiffs' claim in those counts based in NEPA"). As there is a private right of action under NEPA, the plaintiffs are entitled to proceed with their FWCA claims on that basis. *See Texas Committee,* 736 F.2d at 268. The Court's review of the Corps' degree of coordination with the Fish and Wildlife Service is governed by the arbitrary and capricious standard, pursuant to the APA.

---

**33.** The applicable Corps regulation contains the following language:

"In accordance with the [FWCA], district engineers will consult with the [Fish and Wildlife Service] with a view to the conservation of wildlife resources by prevention of their direct

and indirect loss and damage due to the activity proposed in a permit application. The [Corps] will give full consideration to the views of [the Fish and Wildlife Service] on fish and wildlife matters in deciding on the issuance, denial, or conditioning of individual or general permits." 33 C.F.R. § 320.4(c).

The administrative record clearly shows that the Fish and Wildlife Service did not have a reasonable opportunity to respond to the City's third and final proposal, which would result in the destruction of 7.4 acres of wetlands, prior to the Corps' decision to issue a permit authorizing the City to do so. However, the Corps had consulted the Fish and Wildlife Service with respect to both the first (19.9 acres of wetlands) and second (16.9 acres of wetlands) proposals made by the City. Indeed, the administrative record contains two detailed letters to the Corps submitted by the Fish and Wildlife Service, the first of which is dated February 21, 1996, and the second of which is dated April 30, 1996. Admin.Record, at tabs 27, 73. Though not the only issue raised, a focal point of both letters was the Fish and Wildlife Service's concern that the Corps had not fully evaluated the possibility of avoiding wetland use altogether by constructing the entire facility on uplands on the McGowin tract.[34] *Id.*

The EA prepared by the Corps and released on May 28, 1996 detailed the objections and recommendations raised by the Fish and Wildlife Service in its correspondence, and explained in great detail how the Corps had responded to those issues and why the Corps had determined that the City's third proposal effectively addressed those concerns to the greatest extent possible. Admin.Record, at pp. 00757–60. With respect to the concerns regarding wetland avoidance, the Corps wrote the following: "We believe that the proposed reductions in wetland impacts to 7.4 acres minimizes impacts to the maximum practical level." Admin.Record, at p. 00759. The Corps also expressed its belief that further coordination with the Fish and Wildlife Service after the City submitted its third proposal was not required by the applicable statutes or regulations, inasmuch as the Fish and Wildlife Service had not provided a 3(b) letter elevating

the dispute to the agencies' respective national offices. Admin.Record, at p. 00760. Thus, the Corps clearly indicated that it had considered its sister agency's recommendations, and articulated its reasons for finding that the City's third proposal provided the best possible accommodation of those recommendations.

■ The Court agrees with the Corps' interpretation of the FWCA and the applicable regulations. Nowhere do those authorities provide that the Corps must consult with the Fish and Wildlife Service at every iterative stage of a wetlands fill proposal. Nor must the Corps adhere rigidly to the recommendations given it by the Fish and Wildlife Service. *See Texas Committee,* 736 F.2d at 268 (Corps satisfies statutory requirements by giving serious consideration to views of Fish and Wildlife Service); *Sierra Club v. Alexander,* 484 F.Supp. 455, 470 (N.D.N.Y. 1980) (holding that FWCA requires only that agency give views of Fish and Wildlife Service serious consideration, not that its decision correspond to those views); *County of Bergen v. Dole,* 620 F.Supp. 1009, 1063 (D.C.N.J.1985) (same); *Lake Erie Alliance for Protection of Coastal Corridor v. U.S. Army Corps of Engineers,* 526 F.Supp. 1063, 1081 (W.D.Pa.1981) (same). Rather, it is enough that the Corps give the Fish and Wildlife Service a meaningful opportunity to comment at some point after a permit application is submitted and before a permit is issued, and that the Corps seriously consider the Fish and Wildlife Service's recommendations and incorporate a discussion of said recommendations into its report. All of those steps were followed here. In the EA, the Corps recited the Fish and Wildlife Service's concerns, and explained its belief that the City's third proposal alternative provided the best possible resolution of those concerns. Nothing more was required of the

---

34. In the February 21 letter, the Fish and Wildlife Service wrote that: "We believe the applicant should demonstrate why this stadium must be constructed in wetlands. If it can be satisfactorily concluded that there is no other viable alternative site, the Service would be amenable to permit issuance" under certain circumstances. Admin.Record, at p. 00216. Likewise, the April 30 letter asserted the following: "In view of the

adjacent uplands at the ball park project site, avoidance mitigation seems to be a viable option in lieu of filling wetlands for a non-water dependent use. The reasons for not avoiding wetland impacts should be adequately explained before agency acceptance of compensation for unavoidable wetland impacts is sought." Admin.Record, at pp. 00446–47.

Corps. Therefore, the Court concludes that the Corps' failure to consult with the Fish and Wildlife Service following the City's submission of its third plan for the stadium complex cannot be branded arbitrary, capricious, or otherwise unlawful.

It is true that enhanced coordination between and among federal agencies is a laudable and worthy goal. Though increased communication between the Fish and Wildlife Service and the Corps throughout the pendency of the City's permit application may well have been beneficial and desirable in this case, the Corps' limited coordination with the Fish and Wildlife Service did not run afoul of the FWCA or NEPA, and was not arbitrary and capricious under the APA.

#### c. Failure to Provide Notice to Public

The plaintiffs also maintain that there was inadequate notice given to the public following the City's submission of its third stadium proposal to the Corps. On January 22, 1996, the Corps provided public notice of the City's original plan for the stadium complex, which plan would result in the filling in of 19.9 acres of wetlands. Admin.Record, at tab 12. The notice invited comment from the public, so long as said comments were received by the Corps prior to February 25, 1996. *Id.* During the notice and comment period, the Corps received over 250 responses from members of the public. Admin.Record, at tab 44. Subsequent requests to reissue the public notice were denied by the Corps on the grounds that numerous individuals had responded to the original notice, that the ballpark plan had received extensive news media coverage, and that the ballpark proposal had not changed radically as of April 1996. Admin.Record, at tabs 44, 45. On May 24, 1996, the Corps denied a request for public hearing as to the City's third proposal on the ground that "a public hearing would not provide any additional information which would assist in making a final decision in this request for a permit." Admin.Record, at tab 114. No public notice was issued by the Corps regarding the 7.4 acre plan and concomitant alterations in design and configuration of the stadium complex prior to its decision to grant the permit on May 28, 1996.

While the plaintiffs are correct that no supplemental public notice was issued by the Corps following the City's submission of its third proposal, they ignore the fact that no such notice is required under the relevant CWA regulations. Indeed, "the applicable regulations give the Corps discretion about whether to issue supplemental public notice about such matters." *Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 545 (11th Cir.1996); *see also* 33 C.F.R. § 325.2(a)(2) ("The district engineer will issue a supplemental, revised, or corrected public notice if in his view there is a change in the application data that would affect the public's review of the proposal."); *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.,* 988 F.2d 989, 996–97 (9th Cir.1993) (public hearing unnecessary where Corps has provided adequate notice of permit application and where Corps is aware of public sentiment on both sides of the issue). The Corps determined that no public hearing or additional notice was necessary because such events would not provide information to the Corps which would assist in determining whether to grant or deny the permit application. Furthermore, the plaintiffs have offered the Court no basis for disturbing this decision as arbitrary, capricious, or abuse of discretion on the part of the Corps. Accordingly, the Court finds that the Corps' decision not to issue supplemental public notice was not violative of the CWA, NEPA, or the APA.

#### 3. Nationwide Permit Option

The plaintiffs have failed to meet their burden of demonstrating that the Corps' decision to issue the wetlands fill-in permit to the City under § 404(b) of the CWA was arbitrary and capricious. Although the Court's inquiry could begin and end with its discussion of the section 404 requirements, the defendants have offered an additional reason why the issuance of the permit was not arbitrary, capricious, or otherwise erroneous. Specifically, they assert that even if the section 404 requirements had been breached by the Corps in this case, the agency still possessed authority to issue the wetlands fill-in permit to the City in the form of a so-called Nationwide Permit Number 26 ("NWP 26"). Thus, the defendants allege,

any error in the section 404 permitting process is rendered moot by the fact that the permit could have been issued by the Corps to the City as a NWP 26 permit without wading through the procedural morass of section 404.[35]

The applicable regulation establishing the Corps authority to issue a NWP 26 permit is set forth at 33 C.F.R. § 330.5(a)(26), which authorizes "discharges which cause the loss or substantial adverse modification of 1 to 10 acres" of either waters above the headwaters or isolated waters, including wetlands.[36] 33 C.F.R. § 330.5(a)(26)(ii). As several courts have commented, an NWP 26 permit has the desirable feature of being "automatic which means that if one qualifies for such a permit no application is needed nor must notice be given before beginning the discharge activity." *Shelton v. Marsh,* 902 F.2d 1201, 1205 (6th Cir.1990); *Riverside Irrigation District v. Stipo,* 658 F.2d 762, 764 (10th Cir.1981). Stated differently, when a project qualifies for a NWP 26 permit, the applicant need not secure the approval or follow the procedures otherwise required under section 404 of the CWA in order to obtain authorization from the Corps to fill wetlands. *See Shelton,* 902

F.2d at 1205. Moreover, the fact that the Corps chooses, as an initial matter, to treat a permit application under section 404 is of no consequence in assessing the eligibility of the permit applicant for consideration under NWP 26. Indeed, the Sixth Circuit has held that the Corps' issuance of a defective section 404 permit does not require set-aside or remand of the Corps' decision where the agency subsequently superseded and replaced the 404 permit with a NWP 26 permit which could have been issued in the first instance. *See id.* at 1204–1205.

In its final form, the City's proposal encompassed only 7.4 acres of wetlands; therefore, it satisfies the acreage requirement for eligibility for a NWP 26 permit.[37] The sole remaining qualification is whether the wetlands at issue satisfy 33 C.F.R. § 330.5(a)(26)(i)–(ii) by being either (1) above the headwaters or (2) isolated waters. The first alternative appears inapplicable, as there is no evidence before the Court suggesting that the acreage in question lies above the headwaters. "Isolated waters" are defined as non-tidal waters which are "(1) Not part of a surface tributary system to interstate or navigable waters of the United States; and (2) Not adjacent to such tribu-

**35.** The Corps originally opted for the section 404 permitting process rather than that applicable to a NWP 26 permit because the original scope of the proposed wetlands fill was well in excess of the 10 acre limit for eligibility for a NWP 26. In its final form, the City's proposal was amenable to NWP 26 procedures; however, the Corps opted to continue with the section 404 process which had been previously initiated in this case.

**36.** The applicable regulation states that any discharge causing the loss or substantial adverse modification of less than 10 acres of wetlands is eligible for NWP 26 status if it falls into one of the following two categories:
"(i) Non-tidal rivers, streams, and their lakes and impoundments, including adjacent wetlands, that are located above the headwaters. (ii) Other non-tidal waters of the United States, including adjacent wetlands, that are not part of a surface tributary system to interstate waters or navigable waters of the United States (i.e., isolated waters)." 33 C.F.R. § 330.5(a)(26); *see also United States v. Marathon Development Corp.,* 867 F.2d 96, 98–99 (1st Cir.1989).

**37.** The plaintiffs contest the defendants' ability to satisfy this criterion. They correctly point out

that the issue is not whether the area of wetlands fill itself exceeds 10 acres, but whether the fill will "cause the loss or substantial adverse modification of 10 acres or more." 33 C.F.R. § 330.5(a)(26); *see also Industrial Highway Corp. v. Danielson,* 796 F.Supp. 121, 129 n. 6 (D.N.J. 1992) (noting that "it is not a foregone conclusion that [applicant's] proposed discharge of fill into 2.45 acres of wetlands would result in the loss or adverse modification of only 2.45 acres of United States waters"). Plaintiffs offer unsubstantiated allegations about the effects of engine oil drippings, antifreeze, and other automobile pollutants which, they assert, could adversely affect the 32–plus acres of wetlands which will adjoin the stadium parking lot after the fill-in of the 7.4 acres of wetlands is complete. These contentions notwithstanding, there is no evidence whatsoever that the proposed wetlands fill will result in the loss or substantial adverse modification of any wetlands acreage beyond the 7.4 acre fill-in itself. Certainly, there is no basis for concluding that there will be substantial adverse effects on more than 10 acres of wetlands resulting from the 7.4 acre fill-in contemplated in this case. Hence, the Court finds that the plaintiffs' objection on this front is without merit.

tary waterbodies." 33 C.F.R. § 330.2(e); *Reichelt v. U.S. Army Corps of Engineers*, 923 F.Supp. 1090, 1094 (N.D.Ind.1996).

Clearly, the wetlands in question are not themselves part of a surface tributary system; therefore, the Court's inquiry focuses on whether they are "adjacent" to tributary waterbodies. The regulations define "adjacent" as meaning "bordering, contiguous, or neighboring". 33 C.F.R. § 328.3(c); *see also United States v. Banks*, 873 F.Supp. 650, 658 (S.D.Fla.1995). Wetlands which are separated from other waters of the United States by "man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'" 33 C.F.R. § 328.3(c); *United States v. Tilton*, 705 F.2d 429, 431 (11th Cir.1983). In determining whether particular wetlands are "isolated" or "adjacent", courts have considered such factors as the distance between the wetlands and the nearest rivers or tributaries and the extent of the hydrological and ecological links between the wetlands and the river system. *See Tilton*, 705 F.2d at 431 & n. 1 (relying on physical proximity, as well as hydrological and ecological linkages, in reaching finding of adjacency); *United States v. Banks*, 873 F.Supp. 650, 659 (S.D.Fla.1995) (finding of adjacency is "bolstered" by presence of hydrological and ecological links).

The site maps and Corps analysis in the administrative record clearly demonstrate that the wetlands at issue in this case are "surrounded by an interstate highway, commercial and residential development. Admin.Record, at p. 00747; *see also* pp. 00163–64, 00743–00746. Likewise, the Corps has repeatedly characterized these wetlands as "isolated." Admin.Record, at p. 00747 (describing wetland at proposed stadium site as "isolated remnant of much larger wetland area"); Admin.Record at tab 12 (describing affected waterway as "isolated wetland"). The plaintiffs have made no showing to corroborate their contention that these wetlands are actually adjacent to a surface tributary system to Dog River.[38] Moreover, the only evidence in the record regarding the ecological and hydrological links between the wetlands and Dog River suggests that those connections are virtually nonexistent. Admin.Record, at p. 00748 ("In general, the wetlands provide very limited flood water and contaminant filtration functions and even when combined with surrounding uplands, provide very low quality wildlife habitat."). Simply stated, there is no evidence before the Court from which it could conclude that the 7.4 acre site is bordering, contiguous or neighboring a surface tributary system to Dog River.[39] Finally, the Court's own review of the site maps lends very strong support to the Corps' description of these wetlands as "isolated" from any navigable waters or tributary system thereto.

In light of the foregoing analysis, the Court concludes that the 7.4 acres of wetlands at issue in this matter are in fact isolated wetlands. Accordingly, had it chosen to do so, the Corps could have authorized the wetlands fill through issuance of a NWP 26 permit, rather than a section 404 permit. This finding means that, even if the section 404 procedures were somehow lacking or deficient, the Corps' decision to issue the permit withstands "arbitrary and capricious"

---

**38.** In an exhibit to the motion for preliminary injunction, the plaintiffs present an affidavit from Margorie Welch, in which she avers that she had a conversation with Mark LaRue of the EPA on July 26, 1996. *See* Exhibit L to Plaintiff's Motion for Preliminary Injunction. In this affidavit, Ms. Welch attributes to Mr. Welch certain statements reflecting his opinion that the permit could not have been issued under NWP 26 because they were not isolated, from a technical standpoint. Had the plaintiffs wished to present this testimony to the Court, they should have either called Mr. LaRue as a witness themselves or submitted other credible evidence on the isolated/adjacent question. As it stands, the statements in Ms. Welch's affidavit are rank hearsay which will not be considered by the Court in assessing whether the wetlands at issue are isolated. Even if they were admissible, such statements would not assist plaintiffs, for Mr. LaRue apparently offered Ms. Welch little explanation of the basis for his opinion.

**39.** In fact, it appears that the wetlands on the McGowin tract drain into man-made drainage ditches which flow into creeks which eventually feed into Dog River. Such attenuated connections between the wetlands and a tributary system cannot possibly have been contemplated as "adjacent" by the drafters of the NWP 26 regulations; otherwise, the term "isolated waters" would be bereft of meaning.

scrutiny by this Court, pursuant to NWP 26 and *Shelton.* Because the Corps could have issued a NWP 26 permit to the City, any defects in the section 404 process would be immaterial.

### F. Continuing Irreparable Injury to Plaintiffs

As the foregoing analysis demonstrates, the plaintiffs cannot succeed on the merits of their claims that the defendants violated various statutory and regulatory provisions. That failing on the plaintiffs' part is sufficient, in and of itself, to bar them from the relief they seek. However, their quest for a permanent injunction is also due to be denied on the basis of their failure to establish any continuing irreparable injury in the event that the City is not enjoined from proceeding with its plans to fill the wetlands and construct the baseball stadium and parking lot on the site presently contemplated. *See Newman v. State of Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982) (injunctive relief will not be granted in absence of showing of continuing irreparable injury); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922 (4th Cir.1995); *New York State National Organization for Women v. Terry,* 886 F.2d 1339 (2d Cir.1989) (same).

The plaintiffs have never offered the Court any evidence which suggests that they will suffer a continuing irreparable injury in the absence of injunctive relief. Meanwhile, at trial, the defendants offered the expert testimony of Dr. Barry Vittor ("Dr. Vittor"), who testified as to whether the loss of the 7.4 acre tract of wetlands in question could be mitigated. Dr. Vittor opined that he had performed between six and twelve wetlands mitigation projects, all of which had been successful in creating wetlands functions to those lands. According to Dr. Vittor, the loss of the 7.4 acres of wetlands could be successfully mitigated by creation of 15 acres of wetlands in the Three Mile Creek drainage north of the project site. Albeit in a different drainage, the ultimate impact will be felt in Mobile Bay in which both Three Mile Creek and Dog River ultimately drain.[40] The plaintiffs did not counter Dr. Vittor's testimony with any expert testimony suggesting that the imminent harms alleged by plaintiffs are otherwise irreparable. Stated simply, the plaintiffs have made no showing that they will be irretrievably injured if the City proceeds with its plan to fill 7.4 acres of transitional wetlands on the McGowin tract in accordance with its proposed baseball stadium complex.

In light of the plaintiffs' failure to carry their burden of establishing an irreparable injury in the absence of the issuance of a permanent injunction, the Court finds that the irreparable injury criterion constitutes a separate and independent basis for denying them the permanent injunctive relief which they seek.

### III. Conclusion

For all of the foregoing reasons, the Court finds in favor of the defendants on all of the causes of action asserted by the plaintiffs. The plaintiffs' claims for permanent injunctive relief are due to be, and the same hereby are, **DENIED,** and this action is hereby **DISMISSED with prejudice.**

It is so **ORDERED.**

---

**40.** In reaching these expert opinions, Dr. Vittor relied on his observations that the wetlands involved in this case are isolated low quality, transitional wetlands, rather than river swamp. This characterization of the wetlands at issue in this case finds ample support in the administrative record. *See* Admin.Record, at p. 00748 ("In general, the wetlands provide very limited flood water and contaminant filtration functions and even when combined with surrounding uplands provide very low quality wildlife habitat, compared to undisturbed areas in a rural setting.").